· · · 397 P.2d 205· ·

**Application of Jack LEVINE for Admission to the State Bar of Arizona.**

No. 8429.

Supreme Court of Arizona.

En Banc.

· · Dec. 11, 1964.

Rehearing Denied Jan. 12, 1965.

Langerman & Begam, Phoenix, for applicant.

Rouland W. Hill, Chairman, and Mark Wilmer, Member, Phoenix, for Committee on Examinations and Admissions.

STRUCKMEYER, Justice.

This is an original application by Jack Levine for admission to the State Bar of Arizona. Levine passed the written examination for admission in February of 1964; however, the Committee on Examinations and Admissions declined to recommend his admission. We directed the committee to show cause why Levine should not be admitted and, on its response admitted him to practice on July 27, 1964, with an opinion of the Court to follow.

Applicant is thirty years old, a native citizen of the United States, was graduated

with a degree in law from New York University and was admitted to practice law in the State of New York on June 20, 1960. In September of 1960, he was employed by the Federal Bureau of Investigation and continued in its employ for a period of about eleven months, at which time he resigned assigning as the reason that it was to assume family business responsibilities. Three weeks later he requested reinstatement but was advised, in part, by the Bureau's Director, J. Edgar Hoover, " * * * we are unable to re-employ you at this time and it does not appear likely that we shall do so in the near future." Applicant practiced law in New York City until he established a residence in Arizona.

The committee reported to this Court that after Levine was denied reinstatement he wrote letters to the Senate Appropriations Committee, House Committee on Appropriations and House Government Operations Committee, charging irregularities in the manner in which the Bureau was operated; that he authored an article published in the October 20, 1962, edition of "The Nation" entitled, "Hoover and the Red Scare," in which article he made representations which were fictitious and disclosed information which had come to him solely in his employment with the Federal Bureau of Investigation; that applicant, from time to time, made other charges derogatory of the Bureau

and its Director, Hoover, which, in general, were not true. The committee was of the opinion that the charges tended to undermine the confidence of the public in the Federal Bureau of Investigation and concluded that applicant "does not possess the sense of public responsibility which a lawyer should have."

On February 13, 1964, the committee advised Levine that it was investigating his application for admission to the State Bar and that it desired to inquire into his association with the Bureau and statements which he was alleged to have made concerning its organization and operation. Two hearings were held, at which the subject of inquiry was his relations with the Bureau and his activities in the writing and publication of the articles and statements made by him concerning it and its Director. Levine requested that any communications to the committee or other relevant material be made available for his examination. His request was not then or ever granted. This brings us to the fundamental problem which permeated the atmosphere surrounding this application and which led this Court to overrule the committee.

■■ We have held the practice of law rises above that of a mere privilege. For those who have the necessary qualifications, it is a right. Application of Burke, 87 Ariz. 336, 351 P.2d 169. The right to practice law is neither greater nor less than the right to

engage in other occupations, businesses or trades, for the right to seek and retain employment is shared by all equally and to be equal must be upon the same conditions. It cannot be treated as a matter of grace or favor, Willner v. Committee on Character and Fitness of New York, 373 U.S. 96, 83 S.Ct. 1175, 10 L.Ed.2d 224.

We have held on various occasions that one may not be excluded by state action from a business, profession or occupation in a manner or for reasons which contravene the due process clause of the Fourteenth Amendment of the Constitution of the United States, and that due process means that there must be given notice of time and place of hearing, a reasonable definite statement of the charge or charges, the right to produce witnesses and to examine adverse witnesses and to have a full consideration and determination according to evidence before the body with whom the hearing is held. Bennett v. Arizona State Board of Public Welfare, 95 Ariz. 170, 388 P.2d 166; Forman v. Creighton School District No. 14, 87 Ariz. 329, 351 P.2d 165. See McGee v. Arizona State Board of Pardons and Paroles, 92 Ariz. 317, 376 P.2d 779. Compare Greene v. McElroy, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377; Lewis v. City of Grand Rapids, Michigan, D.C., 222 F.Supp. 349. We believe that there is inherent in our democratic system the right to compete freely on an equal basis for the material goods of existence and that the right

is protected by the due process and equal protection clauses of the Fourteenth Amendment. See Schware v. Board of Bar Examiners, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796.

In Arizona, as a prerequisite to the admission to practice an applicant has the burden of establishing his good moral character. If the proof of good moral character falls short of convincing the Committee on Examinations and Admissions, it is its duty not to recommend admission. Application of Courtney, 83 Ariz. 231, 319 P. 2d 991. If the committee believed that there was doubt as to Levine's good moral character, its plain duty was to refuse to certify his name to this Court for admission, for the ultimate responsibility for the admittance to the practice of law lies in the members of the Court.

The Committee on Examinations and Admissions, as an investigatorial body, is not required to bring formal charges against one who seeks admission to the practice of law, for an applicant is in no sense on trial. He is simply obliged to convince the committee that he is worthy of its recommendation. It is the duty of the committee to investigate the applicant's qualifications and his fitness to practice law. At all stages in the investigation, it is the applicant's right to produce witnesses and evidence on his own behalf and, if there are accusers and adverse witnesses,

to be confronted by and to examine them. It is, finally, the responsibility of the committee to consider the evidence on the open record and recommend to this Court only those applicants who, in the opinion of the committee, have satisfactorily established their qualifications. Application of Burke, supra.

█ If the committee fails to recommend the admission of an applicant, he may challenge the committee's conclusions by an original application to this Court, Application of Courtney, supra. This Court will direct the committee to show cause why the applicant has been refused a favorable recommendation and on the applicant's petition and the committee's response, using our independent judgment, de novo determine whether the necessary qualifications have been shown.

This brings us to the reasons the committee refused to certify Levine.

In its investigation of the applicant, there were held two hearings at which Levine was the only witness. At both hearings he was examined only on matters concerning his relations with the Federal Bureau of Investigation. The committee was in possession of what was stated to be a "purported copy" of testimony of J. Edgar Hoover before a subcommittee of the Committee on Appropriations for the House of Representatives, 88th Congress, First Session. Apparently, accompanying Hoover's

testimony were certain documents, for example, copies of correspondence between Hoover and Levine, a copy of the article published in "The Nation" and a transcribed reproduction of a radio broadcast by Levine from Radio Station WAMU–FM, Washington, D. C., Oct. 30, 1962. No copy of Hoover's testimony was shown to Levine nor was it included in the record forwarded to this Court in response to Levine's application for admission to practice. If Hoover's testimony before the subcommittee were used by the Committee on Examinations and Admissions for any purpose other than to suggest areas of investigation, it would, of course, be hearsay and a denial of due process in that Levine would be denied the right of confrontation, Willner v. Committee on Character and Fitness of New York, supra (373 U.S. at 105, 83 S.Ct. 1175). We, therefore, treated Levine's testimony as uncontradicted and accepted it as controlling the determination.

In support of its response, the committee filed a brief, addressed to the principal points giving rise to its doubts as to Levine's integrity. We confine this decision to the matters there raised; other matters suggested by the response are deemed abandoned.

As a basis for its conclusion that Levine does not possess the sense of public responsibility which a lawyer should have, the committee points to his letter request-

ing reinstatement and his protestations therein of loyalty and regard for the Federal Bureau of Investigation, urging that if these statements are true then his later charges must necessarily be untrue. The committee's conclusion is that Levine assumed the role of a "dissembler" in order to be reinstated.

We do not think, however, the record compels this conclusion. Shortly after Levine was refused reinstatement, he applied for a job as an attorney with the Justice Department at Washington, which was denied in November of 1961. He also applied for a job as an attorney with the United States Attorney's Office for the Southern District of New York, to which application he never received an answer. He learned from a personal friend in the Department of Justice, "the reason that * * * I couldn't start working at the Justice Department was because of interference by the FBI. And I also asked him whether this had affected or would affect my application with the U. S. Attorney's office, and he said it would." It was not until after this that Levine made public charges against the Director of the Bureau.

It is not our responsibility here to judge the merits of Levine's quarrel with the Director of the Federal Bureau. It is only our duty to determine whether the record necessarily requires the conclusion that Le-

vine does not have the requisite good moral character. Nor do we think it is necessary to comment more than briefly on the force of the facts elicited, being of the view that the recital here is sufficient to indicate the basis for our conclusions.

Levine draws a distinction between his quarrel with the Director of the Federal Bureau of Investigation and the Bureau itself. He was asked this question:

> " * * * after your application for reinstatement was turned down and after your application for a job with the Department of Justice was denied on the basis of what you thought the FBI had done, you became quite angry and mad at both Mr. Hoover and his bureau, did you not?"

To which he replied:

> *　　*　　*　　*　　*　　*

> "Not with respect to the bureau. I felt that—I felt, and I still feel an intense loyalty and dedication to the bureau and to its agents. I did feel, and still do feel, that Mr. Hoover's policies have handicapped the bureau to a great extent and that—and I feel that Mr. Hoover has gone to extreme lengths to try and discredit me and attack my character."

The committee points to Levine's charge that the Bureau threatened agents who desired to resign and blacklisted from other

employment those who did. At the first hearing, Levine testified:

"A Well, the Bureau's policy, in order to keep the turnover rate from being much higher, is to make it difficult for agents who are trying to obtain employment after they resign. Many of them have had very bad experiences in this respect, and the agents are aware of this, and I think this has had a retarding effect on the turnover.

"Q In what way is it difficult for them to find employment?

"A Well, in applying for the jobs they would get bad recommendations in some instances, and in some instances pressure will be brought to bear on other Government agencies and officials with whom applications are pending. They will be dissuaded from hiring that man."

At the second hearing, he testified:

"Q You have stated also that one of the reasons the agents stayed with the FBI is because they were afraid to quit.

"A Yes, sir.

"Q Can you give me the names of any agents who told you they were staying with the FBI because they were afraid to quit?

"A Oh, an agent by the name of Bill McDaniel.

"Q Was he in the Detroit field office?

"A Yes. Robert Rainley.

"Q Was he also in the Detroit field office?

"A Yes. Roy McPolen.

"Q In the Detroit field office?

"A Yes, and there are a number of others, too, whose names I can't recall right now.

"Q But those three specifically mentioned to you that they were afraid to quit because they, in effect, were afraid of being blackballed by the bureau?

"A Yes, sir. * * *"

On January 28, 1962, Levine wrote a letter to the House Committee on Appropriations directing its attention to the employee overtime practice of the Federal Bureau in the Detroit office. Levine testified concerning this incident:

"In the Detroit office and several other offices, several other FBI Field Offices, many of the agents were forced to falsify their overtime records."

Later he testified that as a result of his disclosures:

"I am told that the exaggeration of the Bureau's overtime records has since been discontinued."

The committee points out that in the article "Hoover and the Red Scare," published

in "The Nation," certain purported factual statements were not true. Levine stated:

"* * * it's glamorized, but I think for the most part it is factual."

In one instance, he specifically testified:

"Q Then do I understand that this reference [in The Nation] to a highly confidential memorandum was a figment of your imagination?

"A In a good part, yes. This is how I imagined that it would—this is how I imagined, knowing what I did about the bureau's internal operations, communications would come down from Mr. Hoover to the various field offices and FBI officials who were involved."

At another time, he testified that some of the matters written as factual were "an educated guess."

Levine, in the article, stated that the Bureau threatened Communist Party members with criminal prosecutions, thus forcing them to become informers, and that:

"Q Then going on it [the article] says:

" 'For Party members who could not be cajoled into becoming informants by appeals to patriotism and reason, the bureau utilized other methods. Fear of criminal prosecution under the various internal security laws has been an important factor in making some Com-munists see the error of their ways.' Is that factual?

"A Yes, sir. I believe it is.

"Q And where did you gather that information?

"A Well, I think that generally the criminal law is designed to act as a deterrent to law violators, and this has been the purpose to a great extent, and I think it has been effective with Communists as well as any other criminals.

"Q But I think the inference is there, is it not, Mr. Levine, from this language here, 'Fear of criminal prosecution under the various internal security laws has been an important factor in making some Communists see the error of their ways,' isn't the inference fair that the FBI was using the threat of criminal prosecution to make Communists see the error of their ways?

"A I think that the statement as appears in the magazine article contains an inference that the FBI has been using or—has been using internal security laws as a factor, yes.

"Q Is that factual?

"A I think so.

"Q Where did you learn that?

"A Well, this is—I don't know that I learned it anywhere. It's just something that I believe to be true.

"Q Is there any basis upon which you predicate that statement?

"A Well, I think—I'm quite sure that I have read just what has occurred in various books and magazine articles that I had read attributing this as an important factor: government prosecution of Communists by the government."

\*    \*    \*    \*    \*    \*

"Q Then you go on and say:

" 'Those obdurate enough to survive these pressures could sometimes be forced into cooperation through economic duress. Even Communists have to eat and pay the rent. For those not self-employed or who are not working for other Communists, a phone call from the FBI to an employer could result in chronic unemployment.'

"Were you just conjecturing there or is that something that you know has happened?

"A No; this happens quite frequently.

\*    \*    \*    \*    \*    \*

"Q Well, is it one of the pressures that they use in order to make the Communists or former Communists see the light and inform the FBI about Communist activities?

"A I don't know whether it's a conscious practice but I know that it's done. I know that it has—I suspect it has a result—it has its results."

The committee points out that Levine in a book review, "A Study of Communism" by J. Edgar Hoover, published in the West Side News, was, in effect, comparing Hoover's practices to those of Joseph Stalin. The article in its first paragraph reads:

"In his latest literary endeavor, A SUDY [sic] OF COMMUNISM, FBI Director J. Edgar Hoover appears as an economist, sociologist, psychologist and political historian all wrapped into one. However, this should not startle too many readers. In his pas [sic] public pronouncements, Mr. Hoover has never hesitated to discourse on such diverse subjects as child care, constitutional law, television programming, censorship of books, the responsibilities of the judiciary, the parole system and American foreign policy—and all of this wisdom from one who is self-admittedly the nation's No. 1 Philistine."

The foregoing are typical examples of the matters relied on by the committee to support its conclusion.

The statements by Levine pertaining to pressures brought against Communists, employees of the Federal Bureau of Investigation and overtime expenditures are not impeached by the record. We again emphasize that for our purpose here we accept them as true. Those statements which Le-

vine admitted were not exactly factual but "educated guesses" and the derogatory statements concerning Hoover we think are governed by the principles summarized by the Supreme Court of the United States in New York Times Company v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686.

In discussing principles protected by the First and Fourteenth Amendments applicable to the law of libel the United States Supreme Court reiterated from its former opinions:

> " * * * 'public men, are, as it were, public property,' and 'discussion cannot be denied and the right, as well as the duty, of criticism must not be stifled.' " 376 U.S. 254, 268, 84 S.Ct. 710, 720.

and

> " 'The maintenance of the opportunity for free political discussion to the end that government may be responsive to the will of the people and that changes may be obtained by lawful means, an opportunity essential to the security of the Republic, is a fundamental principle of our constitutional system.' " 376 U.S. 254, 269, 84 S.Ct. 710, 720.

and

> "That erroneous statement is inevitable in free debate, and that it must be protected if the freedoms of expression are

to have the 'breathing space' that they 'need * * * to survive,' * * *." 376 U.S. 254, 271, 272, 84 S.Ct. 710, 721. The Supreme Court of the United States concluded, as we are here constrained to view this case:

> " * * * we consider this case against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." 376 U.S. 254, 270, 84 S.Ct. 710, 721.

Information known to governmental employees is not necessarily secret or confidential and unless its disclosure is inimicable to the security of the government, it should be debated uninhibitedly and robustly. Moreover, no rule or principle of law compels the critic of official conduct in his utterances, public or private, to guarantee absolutely the truth of all his factual expressions, certainly not on the chance that he will be barred from his profession or vocation in case the utterances are later found to be erroneous.

UDALL, C. J., LOCKWOOD, V. C. J., and BERNSTEIN and SCRUGGS, JJ., concurring.