# BAIRD *v.* STATE BAR OF ARIZONA

No. 15.   Argued December 8–9, 1969—Reargued October 14, 1970—
Decided February 23, 1971

1

BLACK, J., announced the Court's judgment and delivered an opinion, in which DOUGLAS, BRENNAN, and MARSHALL, JJ., joined. STEWART, J., filed an opinion concurring in the judgment, *post*, p. 9. HARLAN, J., filed a dissenting opinion, *post*, p. 34. WHITE, J., filed a dissenting opinion, *post*, p. 10. BLACKMUN, J., filed a dissenting opinion, in which BURGER, C. J., and HARLAN and WHITE, JJ., joined, *post*, p. 11.

*Peter D. Baird* reargued the cause for petitioner. With him on the brief were *John P. Frank* and *Paul G. Ulrich.*

*Mark Wilmer* reargued the cause and filed a brief for respondent.

MR. JUSTICE BLACK announced the judgment of the Court and delivered an opinion in which MR. JUSTICE DOUGLAS, MR. JUSTICE BRENNAN, and MR. JUSTICE MARSHALL join.

This is one of two cases now before us from two different States in which applicants have been denied admission to practice law solely because they refused to answer questions about their personal beliefs or their affiliations with organizations that advocate certain ideas about government.[1]   Sharp conflicts and close divisions have arisen in this Court concerning the power of

[1] The other is No. 18, *In re Stolar, post,* p. 23.   See also No. 49, *Law Students Civil Rights Research Council* v. *Wadmond, post,* p. 154.

States to refuse to permit applicants to practice law in cases where bar examiners have been suspicious about applicants' loyalties and their views on Communism and revolution. This has been an increasingly divisive and bitter issue for some years, especially since Senator Joseph McCarthy from Wisconsin stirred up anti-Communist feelings and fears by his "investigations" in the early 1950's. One applicant named Raphael Konigsberg was denied admission in California and this Court reversed. *Konigsberg* v. *State Bar,* 353 U. S. 252 (1957). The State nevertheless denied him admission a second time, and this Court then affirmed by a 5-to-4 decision. 366 U. S. 36 (1961). An applicant named Rudolph Schware was denied admission in New Mexico and this Court reversed, with five Justices agreeing on one opinion, three Justices on another opinion, and one not participating. *Schware* v. *Board of Bar Examiners,* 353 U. S. 232 (1957). In another case an applicant named George Anastaplo was denied admission in Illinois on grounds similar to those involved in *Konigsberg* and *Schware,* and the denial was affirmed by a 5-to-4 margin. *In re Anastaplo,* 366 U. S. 82 (1961). See also *In re Summers,* 325 U. S. 561 (1945). With sharp divisions in this Court, our docket and those of the Courts of Appeals have been filled for years with litigation involving inquisitions about beliefs and associations and refusals to let people practice law and hold public or even private jobs solely because public authorities have been suspicious of their ideas.[2] Usually these denials of employment have not been based on any overt acts of misconduct or lawlessness, and the litigation has

---

[2] See, *e. g., Adler* v. *Board of Education,* 342 U. S. 485 (1952); *Beilan* v. *Board of Education,* 357 U. S. 399 (1958); *Elfbrandt* v. *Russell,* 384 U. S. 11 (1966); *Keyishian* v. *Board of Regents,* 385 U. S. 589 (1967); *United States* v. *Robel,* 389 U. S. 258 (1967).

4

continued to raise serious questions of alleged violations of the First Amendment and other guarantees of the Bill of Rights.[3]

The foregoing cases and others contain thousands of pages of confusing formulas, refined reasonings, and puzzling holdings that touch on the same suspicions and fears about citizenship and loyalty. However we have concluded the best way to handle this case is to narrate its simple facts and then relate them to the 45 words that make up the First Amendment.

These are the facts.

The petitioner, Sara Baird, graduated from law school at Stanford University in California in 1967. So far as the record shows there is not now and never has been a single mark against her moral character. She has taken the examination prescribed by Arizona, and the answer of the State admits that she satisfactorily passed it. Among the questions she answered was No. 25, which called on her to reveal all organizations with which she had been associated since she reached 16 years of age.[4] This question she answered to the satisfaction of the Arizona Bar Committee. Consequently there is no charge or intimation that Mrs. Baird has not listed the organizations to which she has belonged since becoming 16. In addition, however, she was asked to state whether she had ever been a member of the Communist Party or any organization "that advocates overthrow of the United States Government by force or

---

[3] See the cases cited in n. 2, *supra*. See also *Shelton* v. *Tucker*, 364 U. S. 479 (1960); *American Communications Assn.* v. *Douds*, 339 U. S. 382, 445 (1950) (BLACK, J., dissenting); cf. *Bates* v. *Little Rock*, 361 U. S. 516 (1960); *Speiser* v. *Randall*, 357 U. S. 513 (1958); *Wilkinson* v. *United States*, 365 U. S. 399 (1961); *NAACP* v. *Alabama*, 357 U. S. 449 (1958); *Brandenburg* v. *Ohio*, 395 U. S. 444 (1969).

[4] App. 18.

violence." [5]   When she refused to answer this question, the Committee declined to process her application further or recommend her admission to the bar.[6]   The Arizona Supreme Court then denied her petition for an order to the Committee to show cause why she should not be admitted to practice law.   We granted certiorari. 394 U. S. 957.

In Arizona it is perjury to answer the bar committee's questions falsely, and perjury is punishable as a felony. Ariz. Rev. Stat. Ann. § 13–561 (1956).   In effect this young lady was asked by the State to make a guess as to whether any organization to which she ever belonged "advocates overthrow of the United States Government by force or violence."   There may well be provisions of the Federal Constitution other than the First Amendment that would protect an applicant to a state bar from being subjected to a question potentially so hazardous to her liberty.   But whether or not there are other provisions that protect her, we think the First Amendment does so here.   That Amendment, made applicable to the States by the Fourteenth, forbids any "law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble . . . ."   Mr. Justice Roberts, in referring to the First Amendment's guarantee of freedom of religion, said:

> "Thus the Amendment embraces two concepts,— freedom to believe and freedom to act.   The first is absolute but, in the nature of things, the second cannot be.   Conduct remains subject to regulation for the protection of society." *Cantwell* v. *Connecticut,* 310 U. S. 296, 303–304 (1940).

---

[5] Question No. 27, App. 18.

[6] Response of the Committee on Examinations and Admissions to Order to Show Cause.   App. 4.

See also *Schneider* v. *State,* 308 U. S. 147, 160–161 (1939); *West Virginia Board of Education* v. *Barnette,* 319 U. S. 624, 642 (1943). And we have made it clear that: "This conjunction of liberties is not peculiar to religious activity and institutions alone. The First Amendment gives freedom of mind the same security as freedom of conscience." *Thomas* v. *Collins,* 323 U. S. 516, 531 (1945). The protection of the First Amendment also extends to the right of association. As we said in *Schneider* v. *Smith,* 390 U. S. 17, 25 (1968):

> "The First Amendment's ban against Congress 'abridging' freedom of speech, the right peaceably to assemble and to petition, and the 'associational freedom'. . . that goes with those rights create a preserve where the views of the individual are made inviolate."

See also *Shelton* v. *Tucker,* 364 U. S. 479, 485–487 (1960); *Bates* v. *Little Rock,* 361 U. S. 516 (1960); *NAACP* v. *Alabama,* 357 U. S. 449 (1958).

The First Amendment's protection of association prohibits a State from excluding a person from a profession or punishing him solely because he is a member of a particular political organization or because he holds certain beliefs. *United States* v. *Robel,* 389 U. S. 258, 266 (1967); *Keyishian* v. *Board of Regents,* 385 U. S. 589, 607 (1967). Similarly, when a State attempts to make inquiries about a person's beliefs or associations, its power is limited by the First Amendment. Broad and sweeping state inquiries into these protected areas, as Arizona has engaged in here, discourage citizens from exercising rights protected by the Constitution. *Shelton* v. *Tucker, supra; Gibson* v. *Florida Legislative Investigation Committee,* 372 U. S. 539 (1963); Cf. *Speiser* v. *Randall,* 357 U. S. 513 (1958).

When a State seeks to inquire about an individual's beliefs and associations a heavy burden lies upon it

to show that the inquiry is necessary to protect a legitimate state interest. *Gibson* v. *Florida Legislative Investigation Committee, supra,* at 546. Of course Arizona has a legitimate interest in determining whether petitioner has the qualities of character and the professional competence requisite to the practice of law. But here petitioner has already supplied the Committee with extensive personal and professional information to assist its determination. By her answers to questions other than No. 25, and her listing of former employers, law school professors, and other references, she has made available to the Committee the information relevant to her fitness to practice law.[7] And whatever justification may be offered, a State may not inquire about a man's views or associations solely for the purpose of withholding a right or benefit because of what he believes.

Much has been written about the application of the First Amendment to cases where penalties have been imposed on people because of their beliefs. Some of what has been written is reconcilable with what we have said here and some of it is not. Without

---

[7] Respondent has argued that even when an applicant has answered Question 25, listing the organizations to which she has belonged since the age of 16, Question 27 still serves a useful and legitimate function. Respondent urges:

"Assume an answer including an organization by name such as 'The Sons and Daughters of I Will Arise.' This could truly be a Christian group with religious objectives. But also it could be an organization devoted to the objectives of Lenin, Stalin or any other deceased person whose teachings and objectives were not conducive to the continued security and welfare of our government and way of life." Brief for Respondent 8.

The organizations petitioner listed in response to question 25 were: Church Choir; Girl Scouts; Girls Athletic Association; Young Republicans; Young Democrats; Stanford Law Association; Law School Civil Rights Research Council. Respondent does not state which of these organizations may threaten the security of the Republic.

detailed reference to all prior cases, it is sufficient to say we hold that views and beliefs are immune from bar association inquisitions designed to lay a foundation for barring an applicant from the practice of law. Clearly Arizona has engaged in such questioning here.[8]

The practice of law is not a matter of grace, but of right for one who is qualified by his learning and his moral character. See *Schware* v. *Board of Bar Examiners, supra,* and *Ex parte Garland,* 4 Wall. 333 (1867). This record is wholly barren of one word, sentence, or paragraph that tends to show this lady is not morally and professionally fit to serve honorably and well as a member of the legal profession. It was error not to process her application and not to admit her to the Arizona Bar. The judgment of the Arizona Supreme Court is reversed and the case remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

[For dissenting opinion of Mr. Justice Harlan, see *post,* p. 34.]

---

[8] The committee urges that it is entitled to demand an answer to Question 27 because:

"Unless we are to conclude that one who truly and sincerely *believes* in the overthrow of the United States Government by force and violence is also qualified to practice law in our Arizona courts, then an answer to this question is indeed appropriate. The Committee again emphasizes that a mere answer of 'yes' would not lead to an automatic rejection of the application. It would lead to an investigation and interrogation *as to whether or not the applicant presently entertains the view* that a violent overthrow of the United States Government is something to be sought after. If the answer to this inquiry was 'yes' then indeed we would reject the application and recommend against admission." (Emphasis added.) Memorandum in Support of Response to Petition for Order to Show Cause, App. 5–6.

MR. JUSTICE STEWART, concurring in judgment.

The Court has held that under some circumstances simple inquiry into present or past Communist Party membership of an applicant for admission to the Bar is not as such unconstitutional. *Konigsberg* v. *State Bar,* 366 U. S. 36; *In re Anastaplo,* 366 U. S. 82.

Question 27, however, goes further and asks applicants whether they have ever belonged to any organization "that advocates overthrow of the United States Government by force or violence." Our decisions have made clear that such inquiry must be confined to knowing membership to satisfy the First and Fourteenth Amendments. See, *e. g., United States* v. *Robel,* 389 U. S. 258, 265–266; *Law Students Civil Rights Research Council* v. *Wadmond, post,* p. 154, at 165. It follows from these decisions that mere membership in an organization can never, by itself, be sufficient ground for a State's imposition of civil disabilities or criminal punishment. Such membership can be quite different from knowing membership in an organization advocating the overthrow of the Government by force or violence, on the part of one sharing the specific intent to further the organization's illegal goals. See *Scales* v. *United States,* 367 U. S. 203, 228–230; *Law Students Civil Rights Research Council* v. *Wadmond, supra.*

There is a further constitutional infirmity in Arizona's Question 27. The respondent State Bar is the agency entrusted with the administration of the standards for admission to practice law in Arizona. And the respondent's explanation of its purpose in asking the question makes clear that the question must be treated as an inquiry into political beliefs. For the respondent explicitly states that it would recommend denial of admission solely because of an applicant's beliefs that the respondent found objectionable. Cf. *Wadmond, supra,* at

162–163.   Yet the First and Fourteenth Amendments bar a State from acting against any person merely because of his beliefs.   *E. g., West Virginia Board of Education* v. *Barnette,* 319 U. S. 624, 642; *Cantwell* v. *Connecticut,* 310 U. S. 296, 303–304.   Cf. *Carrington* v. *Rash,* 380 U. S. 89, 94.

MR. JUSTICE WHITE, dissenting.*

I am quite unable to join the opinions of MR. JUSTICE BLACK announcing the judgments of the Court in these cases.   It is my view that the Constitution does not require a State to admit to practice a lawyer who believes in violence and intends to implement that belief in his practice of law and advice to clients.   I also believe that the State may ask an applicant preliminary questions that will permit further investigation and reasoned, articulated judgment as to whether the applicant will or will not advise lawless conduct as a practicing lawyer.

Arizona has no intention of barring applicants based on belief alone.   This my Brother BLACKMUN makes quite clear.   Its inquiries were designed to ascertain whether an applicant expects actively to support illegal violence or espouses an activist role in implementing that idea.

Ohio takes much the same approach, and in my view both States are right.   If, as a preface to further questions, New York may ask whether an applicant is a knowing member of the Communist Party, although that fact alone would not be ground for exclusion, see *Law Students Civil Rights Research Council* v. *Wadmond, post,* p. 154, Arizona and Ohio may ask about simple membership for the same justifiable reason.   And if investigation reveals the applicant to be actively furthering the illegal

*[This opinion applies also to No. 18, *In re Stolar, post,* p. 23.]

activities of any group or to be without comprehension that advising lawless conduct is incompatible with professional standards, the State should be able to deny admission to the Bar.

As MR. JUSTICE BLACK's opinions hasten to assure us, a State may assure itself of an applicant's "qualities of character" and educational qualifications. Accordingly, it would be entitled to make an assessment of his "honesty" and refuse to license him if firmly convinced by his responses or other record evidence that he would not conform to the standards of integrity expected of the members of the Bar. Neither should it be required to admit to practice a person who believes in violent conduct to achieve social, political, or other ends and who is currently and actively supporting such activities or who expects to do so in the course of advising clients in his professional role. I thus see no constitutional basis for forbidding the asking of perfectly relevant questions designed to ascertain whether an applicant considers it the proper role of the lawyer, as practitioner, to advise and advocate violence as a means for settling disputes or achieving social or political ends. I therefore dissent from the judgments in both of these cases.

MR. JUSTICE BLACKMUN, with whom THE CHIEF JUSTICE, MR. JUSTICE HARLAN, and MR. JUSTICE WHITE join, dissenting.

This, for me, is not at all a case involving mere personal beliefs on the part of Sara Baird.

I have necessarily assumed, and I trust not erroneously, that *Konigsberg* v. *State Bar,* 366 U. S. 36, and *In re Anastaplo,* 366 U. S. 82, both decided on April 24, 1961, have remained good law despite the Court's then close division (Justice HARLAN and Justices Frankfurter, Clark, Whittaker, and STEWART in the majority; Justice BLACK and Chief Justice Warren, and Justices

DOUGLAS and BRENNAN, dissenting). Neither case has ever been expressly overruled. Neither is now expressly overruled. In each of the cases the Court decided, at the very least, as MR. JUSTICE STEWART puts it in his separate concurrence here, that "under some circumstances simple inquiry into present or past Communist Party membership of an applicant for admission to the Bar is not as such unconstitutional."

I think the Court really decided more than that. I say this because (a) in *Konigsberg* the applicant had "reiterated unequivocally his disbelief in violent overthrow, and stated that he had never knowingly been a member of any organization which advocated such action," 366 U. S., at 39; (b) the Court stated that it thought it "clear that the Fourteenth Amendment's protection against arbitrary state action does not forbid a State from denying admission to a bar applicant so long as he refuses to provide unprivileged answers to questions having a substantial relevance to his qualifications," 366 U. S., at 44; that:

> "We likewise regard as untenable petitioner's contentions that the questions as to Communist Party membership were made irrelevant either by the fact that bare, innocent membership is not a ground of disqualification or by petitioner's willingness to answer such ultimate questions as whether he himself believed in violent overthrow or knowingly belonged to an organization advocating violent overthrow," 366 U. S., at 46;

and that:

> "It would indeed be difficult to argue that a belief, firm enough to be carried over into advocacy, in the use of illegal means to change the form of the State or Federal Government is an unimportant consideration in determining the fitness of applicants

for membership in a profession in whose hands so largely lies the safekeeping of this country's legal and political institutions. . . .

.　　　.　　　.　　　.　　　.

"[W]e regard the State's interest in having lawyers who are devoted to the law in its broadest sense, including not only its substantive provisions, but also its procedures for orderly change, as clearly sufficient to outweigh the minimal effect upon free association occasioned by compulsory disclosure in the circumstances here presented," 366 U. S., at 51–52;

and (c) in *Anastaplo* it was observed:

"We have also held in *Konigsberg* that the State's interest in enforcing such a rule as applied to refusals to answer questions about membership in the Communist Party outweighs any deterrent effect upon freedom of speech and association, and hence that such state action does not offend the Fourteenth Amendment." (Footnote omitted.) 366 U. S., at 89.

Petitioner Baird, however, attacked the integrity of these cases before the Arizona court and again attacks their integrity here and claims that, although perhaps distinguishable, the cases "warrant . . . delimiting, and perhaps even overruling in light of the trend since 1961." In my view, Mrs. Baird has now had striking success in her overruling endeavor despite the seeming recognition of the two cases in the opinion of the plurality for reversal (hereafter plurality) and the separate concurrence's definite bow in their direction.

The present case comes here, after argument for the second time, in a stark and clear posture. Mrs. Baird, applicant for admission to the Bar of the State of Arizona, possessor of an academic degree from Colorado College, and possessor of a degree in law from Stanford

14

University, *refuses* to answer, other than to say "Not Applicable," the 27th inquiry of a questionnaire which the Arizona Supreme Court, by rule, has made a part of the application for membership in the State Bar.[1] That question reads:

"Are you now or have you ever been a member of the Communist Party or any organization that advocates overthrow of the United States Government by force or violence?"

The applicant bases this refusal (a) on the fact that in her answer to a preceding inquiry, the 25th, she listed the organizations of which she had been a member since age 16, and (b) on the asserted legal propositions that to compel her to answer is to deny her First Amendment rights of freedom of belief and freedom of association, her Fifth Amendment right not to incriminate herself, and her Fourteenth Amendment right to due process.

In my view, applicant Baird vastly overstates her case. On this record, I would affirm the judgment of the Supreme Court of Arizona in denying Mrs. Baird's petition for admission to practice law in the State's courts.

There are several factors that prompt my conclusion:

1. Mrs. Baird is an intelligent and knowledgeable person. She holds a college degree and a graduate degree, and, as is assumed here, she has demonstrated in the Bar examination an acceptable knowledge and mastery of the law. There is no claim of vagueness or lack of awareness on her part of precisely what Question 27 meant or of what it was intended to probe. The applicant obviously knew the scope of the question and its

[1] See 102 Ariz. XXIV, XXIX, and XXXVII, for the pertinent provisions of Rule 28 (c) in effect at the time Mrs. Baird submitted her application. The rule was amended, effective August 1, 1970, in ways not relevant here. See 106 Ariz. XXXI.

concern with the Party and with forceful and violent overthrow of the Government.

2. Mrs. Baird's use of the "Not Applicable" response to Question 27 is not fully understandable. Of course, she may have so phrased that answer hurriedly in the passing thought that, with her listing of organizations in response to Question 25, buttressed by the statement, "This list includes all organizations that I can recall at this time," and with those organizations on the list obviously not within the contemplation of Question 27, the latter question was, indeed, "not applicable." After all, she did employ the same "not applicable" answer on the form in no less than 16 other places; most of these, because of their conditional context, could well have been left blank and would have been expected to be left blank, despite the general instruction that all questions were to be answered.

Nevertheless she did respond to the inquiry in that manner and, as her brief states, she now has "declined to answer" the question. This, then, leaves this litigation in the posture where the response to Question 27 was not inadvertent and was not the product of any misunderstanding or mistake, where an answer is now flatly refused, and where the applicant, perhaps somewhat defiantly, is content to have the record remain as it is and to have her case won or lost on that record. This is reminiscent of the obstructionist tactics condemned in *Konigsberg* and *Anastaplo*.

3. For Mrs. Baird to say that because she had answered Question 25 and had listed her organization memberships since age 16 she need not respond to Question 27 is no answer at all.[2] To answer the one question fully and to refuse to respond to the other embraces an obvious

---

[2] The majority, of course, obviously would hold that Question 25 also was impermissible. *In re Stolar, post,* p. 23. Mrs. Baird, however, appears to have had no hesitancy in answering that inquiry.

inconsistency of position, for the two questions are related. Furthermore, the questions are not duplicative. By her refusal to answer Question 27, she would place on the Arizona Committee on Examinations and Admissions[3] and on the Supreme Court of Arizona the burden of determining which of the organizations she listed, if any, was an arm of the Communist Party or advocated forceful or violent overthrow of the Government. That, however, is not the task of the Committee or of the Arizona Supreme Court. It is Sara Baird's task. It is a truism, I think, that the Communist endeavor works beneath the surface as well as in the open and that high-sounding names have been the front and the verbal shield for something very different from what the name imports.

4. No one is in a better position to know the aim and purpose and advocacy of an organization than a member. Certainly the Committee and the Arizona Supreme Court, which have other things to do, are not equipped for the task of checking out the identity of every named organization, especially one which might follow the standard of the less said and known, the better. And Mrs. Baird would place this burden on the Committee by submitting partial answers. She gives the appearance of playing a game. The importance of the subject deserves better than that.

5. It has been said that the burden is on the applicant. *Application of Courtney,* 83 Ariz. 231, 233, 319 P. 2d 991, 993 (1957). But a most minimal burden it is. Had she answered "None" to Question 27, that would have been the end of the matter in the absence of obvious prevarication. If she were in doubt, the answer "None to my knowledge" would have accomplished the same result. She chose neither answer. She chose, instead, to remain silent and less than candid.

---

[3] See Arizona Supreme Court Rule 28 (c).

6. The plurality opinion, I feel, fails to place the issue in exact focus. This is not a situation where, as that opinion states, and even would do so in a perjury context, "In effect this young lady was asked by the State to make a guess as to whether any organization to which she ever belonged 'advocates overthrow of the United States Government by force or violence.'" It falls far short of guesswork. Mrs. Baird either knew the answer or she did not know it. If she knew, she coupled her knowledge with an attempt to conceal. If she did not know, she had only to state her lack of knowledge. This was no "guess" and, absent the intent to deceive, it certainly was no guess fraught with the risks of perjury.

7. Although Question 27, concededly, would have been better phrased had it gone on to inquire as to the applicant's own knowing participation in, and promotion of, illegal goals, a realistic reading of the question discloses that it is directed not at mere belief but at advocacy and at the call to violent action and force in pursuit of that advocacy. Contrary to the plurality opinion's conclusion and to that of the separate concurrence, I find nothing in this record that indicates that Mrs. Baird automatically would have been denied admission to the Bar had she answered Question 27 in the affirmative. The record, and the Committee's brief here,[4] disclose exactly the

---

[4] "The Committee would again emphasize that it has formed no judgment as to whether or not Sara Baird should or should not be recommended for admission to the Bar of this State to this Court.

"The Committee would again emphasize to this Court that if the answer to question No. 27 is 'yes' the Committee will then endeavor to ascertain if Sara Baird does adhere to the view that the overthrow of the Government of this State and of the United States by force and violence would be a desirable objective and that she would expect to actively support such views. If this is the conclusion reached by the Committee, it will undoubtedly refuse to recommend Sara Baird for admission to the Bar of the State of Arizona. Should the conclusion be that her membership is of a nominal character

opposite. In its Memorandum, filed with the Arizona court in support of its response to the order to show cause, the Committee stated that no judgment as to recommendation or nonrecommendation for admission had been made; that an affirmative answer to Question 27 would lead to further inquiry as to Mrs. Baird's expectation actively to support the objective of violent overthrow; and that, if her membership is of a nominal character and she does not participate in the advocacy views, there would be no legal basis for refusing a recommendation for admission.[5] The material quoted in the

and that she does not participate and adhere to the views that a violent overthrow of our government is desirable, then the Committee would have no legal basis for refusing to recommend her for admission to practice law under the decisions of the United States Supreme Court . . . ." Respondent's Brief 2.

"The Committee, contrary to the repeated assertions and insinuations to the contrary in Petitioner's Brief, has also made it abundantly clear that *regardless of the political beliefs and views of Sara Baird it is only if she is found to actively believe in the notion and espouses an activist role in implementing the notion that our government be destroyed by force and violence* that a favorable recommendation will be refused her by the Committee. . . ." Respondent's Brief 3.

"The Committee has not and cannot in good conscience certify to the Arizona Supreme Court that Sara Baird has the character and moral fitness to practice law if she does actively support and advocate the overthrow of the Government of the United States by force and violence." Respondent's Brief 6.

"The issue is simple. 'Is one who believes in and who is willing to work to undermine and destroy the Government of the United States qualified to be admitted to the practice of law?' " Respondent's Brief 13.

[5] The Memorandum states as its conclusion:

"The Committee would again emphasize that it has formed no judgment as to whether or not Sara Baird should or should not be recommended for admission to the Bar of this State to this Court.

"The Committee would again emphasize to this Court that if the answer to question No. 27 is 'yes' the Committee will then endeavor to ascertain if Sara Baird does adhere to the view that the over-

plurality opinion's footnote 8 is from the body of the Memorandum; my reading of that material, however, indicates only that further inquiry is then in order. I do not share the opinion's interpretation of that material as being directed to mere belief. The key words are whether "violent overthrow . . . is something to be sought after." That is an inquiry into willingness to participate in violence.

8. There is talk, of course, in the briefs here about whether admission to the Bar and receiving authority to practice law is a "right" or a "privilege." I am old enough and old-fashioned enough always to have regarded it more as a privilege than as a right. I at least thought that was the tradition. A century ago Mr. Justice Field referred to the practice of law by a *qualified* person as a right and not as a matter of the State's grace or favor. *Ex parte Garland,* 4 Wall. 333, 379 (1867). The Arizona court has spoken in similar terms. *Application of Klahr,* 102 Ariz. 529, 531, 433 P. 2d 977, 979 (1967). It could oppositely be stated, with just as much accuracy, as the Bar in its brief here asserts,[6] that "one qualified by character, integrity and learning has the right to practice law." Indeed, this is precisely the way the Arizona court has phrased it: "[T]he practice of law is not a privilege but a right, conditioned solely on the requirement that a person have the necessary mental,

throw of the Government of this State and of the United States by force and violence would be a desirable objective and that she would expect to actively support such views. If this is the conclusion reached by the Committee, it will undoubtedly refuse to recommend Sara Baird for admission to the Bar of the State of Arizona. Should the conclusion be that her membership is of a nominal character and that she does not participate and adhere to the views that a violent overthrow of our government is desirable, then the Committee would have no legal basis for refusing to recommend her for admission to practice law . . . ."

[6] Respondent's Brief 15.

physical and moral qualifications." *Application of Klahr,* 102 Ariz., at 531, 433 P. 2d, at 979. See also *Application of Levine,* 97 Ariz. 88, 90–91, 397 P. 2d 205, 206–207 (1964), and *Application of Burke,* 87 Ariz. 336, 339, 351 P. 2d 169, 172 (1960).

The characterization of Bar admission as a right or as a privilege may be little more than an exercise in semantics. It seems to me that, whichever it may be, the State, in granting the authority to practice law, with what surely is the true privilege, not the right, to be entrusted with a client's confidences, aspirations, freedom, life itself, property, and the very means of livelihood, demands something more of the applicant than a formal certificate of completion of a course of legal study and the ability acceptably to answer a series of questions on a Bar examination. It presumably demands what fundamentally is character. And it is character that a State holds out to the public when it authorizes an applicant to practice law.

9. Judges and Bar Examiners, of course, should hesitate to judge too strictly those seeking entrance to the profession. Certainly the impatience and far-ranging attitudes of youthful years are not, in themselves, disqualifying. That is part of the maturing process, especially for future lawyers who must study, examine, select, and develop their philosophies of life and of their profession. Mr. Justice Frankfurter expressed it well:

> "The bar has not enjoyed prerogatives; it has been entrusted with anxious responsibilities. . . . From a profession charged with such responsibilities there must be exacted those qualities of truth-speaking, of a high sense of honor, of granite discretion, of the strictest observance of fiduciary responsibility, that have, throughout the centuries, been compendiously described as 'moral character.'
>
> .    .    .    .    .

"History overwhelmingly establishes that many youths like the petitioner were drawn by the mirage of communism during the depression era, only to have their eyes later opened to reality. Such experiences no doubt may disclose a woolly mind or naive notions regarding the problems of society. But facts of history that we would be arbitrary in rejecting bar the presumption, let alone an irrebuttable presumption, that response to foolish, baseless hopes regarding the betterment of society made those who had entertained them but who later undoubtedly came to their senses and their sense of responsibility 'questionable characters.' " *Schware* v. *Board of Bar Examiners,* 353 U. S. 232, 247, 251 (1957) (concurring opinion).

10. An attorney, we sometimes tend to forget, is an officer of the court. *Ex parte Garland,* 4 Wall., at 378. Perhaps we read too much into that phrase. But there is a distinct element of fact and of history in it. We have seen, of late, an overabundance of courtroom spectacle brought about by attorneys—frequently those who, being unlicensed in the particular State, are nevertheless permitted, by the court's indulgence, to appear for clients in a given case—who give indications of ignoring their responsibility to the courts and to the judicial process. Question 27 bears upon this facet of an applicant's character.

11. The plurality opinion acknowledges that Arizona has a legitimate interest in determining whether the applicant has the "qualities of character" requisite for the practice of law. But the opinion then goes on to prescribe when, in its judgment, the applicant has given a sufficient amount of information to the committee. I doubt if this Court is the proper tribunal to judge the sufficiency of material supplied for legal practice in Arizona. Of course there is a constitutional limit, but that

limit is marked by the relevant, by the excesses of unreasonableness and of harassment, and by the otherwise constitutionally forbidden. It should not be marked at an arbitrary point where the applicant, for reasons of convenience or assumed self-protection or contrariness, decides that enough is enough.

12. Finally, the State has a measure of a right to protect itself. Its area of possible vulnerability is nowhere greater than in its courts and in its judicial process. Courtroom events disclosed in recent litigation vividly demonstrate this. See *Illinois* v. *Allen,* 397 U. S. 337 (1970); *Mayberry* v. *Pennsylvania,* 400 U. S. 455 (1971). Assurance that applicant Baird at least professes to refrain from forceful and violent overthrow of the Government of which, upon admission, she will become a true and working part, and under which, for better or for worse, she has lived and, judging by her excellent education, has prospered and enjoyed some benefits, is a subject of legitimate inquiry.

As stated above, on this record I would affirm the judgment of the Supreme Court of Arizona.