**Professor Michael LEVIN, Plaintiff,**

v.

**Bernard W. HARLESTON, President of the City College of the City University of New York, individually and in his official capacity; Leonard Roellig, individually and in his official capacity; Michael Arons, individually and in his official capacity; Max Bond, individually and in his official capacity; Juan Flores, individually and in his official capacity; Janice R. Joy, individually and in her official capacity; Marlene MacLeish, individually and in her official capacity; Sheldon Weinbaum, individually and in his official capacity; and Paul Sherwin, Dean of the City College of the City University of New York, individually and in his official capacity, Defendants.**

No. 90 Civ. 6123 (KC).

United States District Court,
S.D. New York.

Dec. 13, 1990.

Scott M. Univer, New York City, for plaintiff.

Clement J. Colucci, New York State Dept. of Law and Jane Denkensohn, New York City, for defendants.

## MEMORANDUM AND ORDER

CONBOY, District Judge:

This action challenges a university's effort to define the circumstances in which it may limit the academic freedom of its professors to express and exchange controversial and offensive ideas in a university setting. Plaintiff Michael Levin is a tenured professor of philosophy at City College who holds controversial views, expressed in his writings and public statements, about race, feminism and homosexuality. Levin's writings and statements, in particular those concerning his view that blacks are intellectually inferior to whites, have led to protests and demonstrations in his classes and on the City College campus.

In response to Levin's statements and the resulting campus unrest, defendant Bernard W. Harleston, President of City College, named a faculty committee [1] "to review the question of when speech both in and outside the classroom may go beyond the protection of academic freedom or become conduct unbecoming a member of the faculty, or some other form of misconduct." Complaint, Exhibit A (letter dated May 4, 1990 from Bernard W. Harleston to the College Community). The Committee was also asked to "review information concerning Professor Michael Levin of the Department of Philosophy, and Professor Leonard Jeffries, Chair of the Black Studies Department,[2] and to include in its report its recommendations concerning what the response of the College should be." *Id.*

In addition, defendant Paul Sherwin, Dean of the City College, established certain "shadow sections" of Levin's required introductory philosophy course. Complaint ¶ 30. By letter dated February 1, 1990, Sherwin informed Levin's students that, because of Levin's controversial and, to some, offensive views, they were being given the option of enrolling in a newly opened second section of Levin's course to be taught by a different instructor. *Id.*

In his complaint, which states claims pursuant to 42 U.S.C. § 1983 and for breach of contract, Levin alleges that the defendants' actions have had a "chilling effect" on his First Amendment right to freedom of speech. He claims that he has felt compelled, because of the Committee's investigation, to turn down numerous speaking and writing opportunities. Levin further alleges that his reputation has been damaged by the stigmatizing effect of the shadow sections. Finally, Levin alleges that he has been harmed by defendants' unwillingness to discourage and punish student demonstrators who disrupt his classes and threaten his safety. Levin seeks compensatory damages [3] and a permanent injunction preventing the defendants from inhibiting his First Amendment rights.

Defendants move to dismiss pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, for lack of subject matter jurisdiction, on the ground that Levin's fears about what the Committee might do in the future do not create a presently justiciable controversy. Defendants argue that because the Committee is purely advisory, without power to institute tenure revocation proceedings, it presents no threat to Levin. Defendants also move to dismiss pursuant to Rule 12(b)(6), for failure to state claims for which relief can be granted.

On December 3, 1990, the Court heard oral argument on the motions. Because the nature and scope of the Committee's charge remained unclear, and because the parties disputed whether the Committee is, as defendants suggest, "purely advisory" (Affidavit of Bernard W. Harleston, sworn to on October 31, 1990, ¶ 3), or, as Levin claims, "a first step to determine whether [Levin] could be removed from the faculty" (Complaint ¶ 36), the Court scheduled an

---

**1.** Defendants Roellig, Arons, Bond, Flores, Joy, MacLeish, and Weinbaum are the seven members of the Committee.

**2.** Professor Jeffries also has controversial and well-publicized views on racial issues.

**3.** The Court notes that the Eleventh Amendment may bar an action for damages against some or all of the defendants here. *See* Byrne, *Academic Freedom: A "Special Concern of the First Amendment"*, 99 Yale L.J. 251, 303 n. 206 (1989). The parties have not yet addressed this issue.

evidentiary hearing on December 6, 1990, to resolve, for the limited purpose of determining justiciability, these and other factual issues. *See Land v. Dollar,* 330 U.S. 731, 735 n. 4, 67 S.Ct. 1009, 1011 n. 4, 91 L.Ed. 1209 (1947) ("when a question of the District Court's jurisdiction is raised ... the court may inquire by affidavits or otherwise, into the facts as they exist"); 2A J. Moore & J. Lucas, *Moore's Federal Practice* ¶ 12.07[2.–1] at 12–47 (2d ed. 1990) (if truth of jurisdictional facts is challenged, "court may receive any competent evidence, such as affidavits, deposition testimony and the like, in order to determine the factual dispute"). At the conclusion of the hearing, the Court ruled orally that it has subject matter jurisdiction. This Memorandum and Order sets forth the basis for that determination.[4]

■ As to the nature and scope of the Committee's charge, Professor Leonard Roellig, the Chairman of the Committee, confirmed that the Committee views part of its charge, in addition to examining the parameters of academic freedom, as defining "conduct unbecoming" a member of the faculty, that is, conduct which triggers tenure revocation proceedings. (Tr. 124)[5] Roellig also testified that the Committee has received and is examining certain of Levin's writings and statements (Tr. 121–22), and that the Committee's report, in defining the limits of academic freedom, will make specific reference to Levin's writings. (Tr. 122) The report may thereby "in fact amount to a criticism of some kind of Professor Levin." (Tr. 125) Roellig then conceded that the Committee's findings with respect to its review of the writings of Levin and Jeffries could lead to the institution of tenure revocation proceedings against Levin and Jeffries. (Tr. 128) Thus, despite its asserted advisory nature, the Committee's mission has an unmistakable punitive aspect directed specifically at Levin.

President Bernard Harleston's testimony illuminated the close connection between the Committee's work and Levin's tenure. Harleston explained that he himself established the Committee and selected its members. (Tr. 137–39) The Committee is thus serving as an arm of his office; it is acting under his charge to them, and will report directly and solely to him. (Tr. 141, 143, 149) Harleston also testified that he, as President of City College, has the sole authority to initiate tenure revocation proceedings. (Tr. 146) When asked how he would respond to the Committee's report, Harleston affirmed, in emphatic terms, that he was "certainly not going to ignore it." (Tr. 146) It would be reasonable to infer from this statement that if the Committee finds that Levin's statements constitute "conduct unbecoming" a professor, Harleston will initiate tenure revocation proceedings.

As to Levin's claim that the City College has failed to follow university guidelines for disciplining student demonstrators, Harleston was unable to address, in concrete and specific terms, the City College's responses to the demonstrations and disturbances in Levin's classes. (Tr. 149–152) According to Professor Levin, the response of Campus Security to a disruption by several dozen persons of one of his classes in progress was to urge that he terminate the class and leave his classroom in their protective custody. (Tr. 87–88) Harleston could not address whether any investigation of this incident was undertaken by the college. (Tr. 152)

Dean Paul Sherwin, answering questions about the decision to create "shadow sections" of Levin's introductory philosophy class, confirmed that never before in his experience at City College have such parallel sections been established. (Tr. 107) Shadow sections have not been offered to students enrolled in classes taught by pro-

---

**4.** The Court makes no factual findings as to the merits of Levin's First Amendment claim that he has been and is continuing to be "chilled" and stigmatized by defendants' actions. Based on the limited record before us from a hearing held on short notice to the parties, we make only provisional findings solely for the purpose of determining whether the Court has subject matter jurisdiction.

**5.** "(Tr. ——)" indicates a reference to the transcript of the December 6, 1990 hearing.

fessors with controversial views about, for example, religion or evolution. Nor have any shadow sections been offered to students in Jeffries' classes (although it is not clear whether Jeffries teaches any required courses). Sherwin further testified that he viewed Levin's situation as presenting singular and unique circumstances requiring the creation of parallel sections. (Tr. 108–109) Although we make no finding as to whether Levin has been, as he himself claims, stigmatized by the creation of the shadow sections, Levin has been singled out by Sherwin for special treatment.

As to the actual harm Levin claims to have suffered as a result of defendants' actions, Levin testified that he had turned down approximately sixteen invitations to speak or write outside the City College community on differences in intelligence between the races and the sexes. (Tr. 62–63) Levin asserted that he feared that making further statements of his controversial views would simply add "fuel to the fire" of the Committee's investigation, giving them more reason to find his conduct unbecoming that of a professor. The State [6] chose not to challenge Levin or cross-examine him on the number and nature of the invitations to speak and write that he has declined, or his reasons for declining them.

To meet his burden of establishing subject matter jurisdiction based on the asserted "chilling effect" defendants' actions have had on his First Amendment rights, Levin points to (1) the close connection between the Committee's investigation and Harleston's potential decision to initiate tenure revocation proceedings against him; (2) the speaking and writing engagements he has declined; and (3) the stigmatizing effect of the shadow sections. Based on these facts, Levin contends that he has established an objectively reasonable basis for his claim that defendants have "chilled" his right to freedom of speech. Defendants respond that Levin has shown at best a solely subjective "chill" insufficient to create a presently justiciable controversy.

■ Article III of the Constitution limits the judicial power of the federal courts to actual cases and controversies. This limitation has been interpreted to bar a party from maintaining a lawsuit unless he has a sufficient stake in the outcome "as to assure that concrete adversariness which sharpens the presentation of issues upon which the Court so largely depends for illumination of difficult constitutional questions." *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). To establish such an interest, a litigant must show that he or she has personally suffered some actual or threatened injury from the putatively illegal conduct, and that it would be redressed by a favorable decision. *Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). The challenged conduct must cause or threaten to cause a direct injury, *Laird v. Tatum*, 408 U.S. 1, 14, 92 S.Ct. 2318, 2326, 33 L.Ed.2d 154 (1972), which injury must be distinct and palpable. *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984).

In cases involving the deterrent or "chilling" effect of governmental actions that fall short of a direct prohibition against the exercise of First Amendment rights, *see, e.g., Baird v. State Bar of Arizona*, 401 U.S. 1, 91 S.Ct. 702, 27 L.Ed.2d 639 (1971); *Keyishian v. Board of Regents*, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); *Lamont v. Postmaster General*, 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965); *Baggett v. Bullitt*, 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964), the same principle applies. That is, "to invoke the judicial power to determine the validity of executive or legislative action [an individual] must show that he has sustained, or is immediately in danger of sustaining, a direct injury as the result of that action. . . ." *Ex parte Levitt*, 302 U.S. 633, 634, 58 S.Ct. 1, 1, 82 L.Ed. 493 (1937), *quoted in Laird v. Tatum*, 408 U.S. at 13–14, 92 S.Ct. at 2325. Thus, no justiciable controversy was presented by a group of citizens who challenged the existence of the United States Army's data-gathering system without ar-

---

**6.** The Attorney General's Office for the State of New York is representing the defendants.

**624**

ticulating "a claim of specific present objective harm or a threat of specific future harm." *Laird v. Tatum*, 408 U.S. at 13–14, 92 S.Ct. at 2326. Because the "chilling effect" alleged by the citizens in *Laird* arose from their distaste for the Army's assumption of a role in civilian affairs or from their apprehension that the Army might at some future date "misuse the information in some way that would cause direct harm to [them]," *id.* at 13, 92 S.Ct. at 2325, the Court held the "chilling effect" allegations insufficient to establish a case or controversy.

In *Socialist Workers Party v. Attorney General*, 419 U.S. 1314, 95 S.Ct. 425, 42 L.Ed.2d 627 (1974), on the other hand, a justiciable controversy was stated by individuals seeking an order barring government agents and informants from attending or otherwise monitoring a national convention of the Young Socialist Alliance ("YSA"), on the ground that the monitoring activities would dissuade some YSA delegates from participating actively in the convention and would lead to possible loss of employment for those who were identified as being in attendance. *Id.* at 1319, 95 S.Ct. at 428. Justice Marshall, writing as a Circuit Justice, found the allegations in *Socialist Workers Party* much more specific and direct than those in *Laird*, and therefore sufficient to satisfy the requirements of Article III. *Id.* at 1319, 95 S.Ct. at 428. Significantly, Justice Marshall distinguished the threshold jurisdictional question from his decision on the merits. "Whether the claimed 'chill' is substantial or not is still subject to question, but that is a matter to be reached on the merits, not as a threshold jurisdictional question." *Id.*

Bearing in mind that a federal claim should be dismissed for lack of subject matter jurisdiction only if the federal claim is clearly frivolous or wholly insubstantial, *Bell v. Hood*, 327 U.S. 678, 682–83, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946), we conclude, based on the pleadings, the documents appended thereto, and the testimony and exhibits presented at the hearing, that the federal constitutional claim in this case presents a justiciable controversy. Professor Levin is faced with an ad hoc committee which is specifically focusing on his writings and statements in determining "when speech may go beyond the protection of academic freedom or become conduct unbecoming a member of the faculty." The threat to Levin from that Committee, with its broad charge and close connection to the President, is sufficiently direct and specific to create a justiciable controversy over Levin's claim that the defendants' actions are "chilling" his First Amendment rights. Whether the claimed "chill" is sufficient to warrant the relief sought in this case is a matter to be reached on the merits, not as a threshold jurisdictional question.

Accordingly, the motion to dismiss the complaint pursuant to Rule 12(b)(1), on the ground that the Court lacks subject matter jurisdiction, is denied. The motion to dismiss under Rule 12(b)(6), on the ground that the complaint fails to state claims for which relief can be granted, is, upon careful review of the pleadings, also denied.

SO ORDERED.