618 P.2d 232

**In the Matter of the Application of Marvin S. LEFF to be admitted as a Member of the State Bar of Arizona.**

No. SB–176.

Supreme Court of Arizona,
In Banc.

Sept. 24, 1980.

Rehearing Denied Oct. 28, 1980.

Lewis & Roca by Walter Cheifetz, Phoenix, for petitioner.

Donald Daughton and James P. Walsh, Phoenix, for respondent State Bar of Arizona.

STRUCKMEYER, Chief Justice.

This is an original application by Marvin Stuart Leff for admission to the State Bar of Arizona. Although Leff successfully completed the written examination, the Supreme Court Committee on Character and Fitness did not find that Leff was of good moral character. A finding of good moral character is a prerequisite for admission to the practice of law in Arizona, as it is in every state in the United States. *Application of Walker*, 112 Ariz. 134, 539 P.2d 891 (1975). Leff thereafter filed in this Court a petition for review of the decision of the Committee on Character and Fitness. We conclude that Leff has such a serious defect in character as to preclude his admission to the State Bar of Arizona.

The Supreme Court Committee on Character and Fitness, in response to the peti-

tion for review, filed its findings and decision with this Court. Such findings and decision, fully supported by the record, read:

"1. On May 9, 1978, the applicant Marvin S. Leff filed with this Committee a completed Application for Admission and requested permission to write the Arizona Bar examination to be administered by the Committee on Examinations in July 1978. That application included question number 11, which reads: 'Have you ever either as a juvenile or adult been served with a criminal summons, questioned, arrested, taken into custody, indicted, charged with, tried for, pleaded guilty to or convicted of, or ever been the subject of an investigation concerning the violation of any felony or misdemeanor? In answering this question include all such incidents, no matter how minor the infraction or whether guilty or not, whether expunged or not, excluding only non–moving traffic violations which resulted in a penalty not exceeding $25.00.' To that question the applicant answered no. The applicant was granted permission to take and did take the July 1978 Bar examination administered by this Committee. The applicant failed to receive a satisfactory grade on the July 1978 Bar Examination.

2. On February 14, 1979, as part of his application to take the February 1979 Bar examination given by the Committee on Examinations of the Supreme Court of Arizona the applicant filed a Statement of Material Changes in Application for Admission which contains the following statement: 'I, the undersigned, hereby certify to the Committee on Character and Fitness that as of the date of the beginning of the examination for admission, which as an applicant I am taking, there have been no material changes in or additions to the facts as shown by my answers to the Application for Admission which have occurred between the date of my filing the Application and the date of the examination, except the following:' Below this statement the applicant put the word 'None' dated it, signed it, and submitted it to the Committee. The Statement of Material Changes in Application for Admission included an explanatory note which said 'Please state any facts not disclosed on your Application which might have a bearing on residence, employment or character qualifications, as well as any other changes or additions as required above. Any answer or violation of any law is considered pertinent.'

3. The applicant was granted permission to take and did take the February 1979 Bar examination administered by the Committee on Examinations. Following a petition for review the applicant was awarded a passing grade on the February 1979 Bar examination.

4. The applicant was first admitted to the practice of law in the State of Illinois in May 1969. He was engaged in the private practice of law in Chicago, Illinois, from May, 1969 until March 1978, when he moved to the State of Arizona. The applicant's practice in Illinois included the representation of numerous defendants in criminal cases.

5. In early 1978 the Internal Revenue Service of the United States commenced an undercover investigation of organized gambling in the State of Arizona. Special Agent James E. Mason was assigned to that investigation. As a part of the investigation, Special Agent Mason engaged in the practice of placing bets with a bookmaker. On Tuesday of each week in which a bet was placed Special Agent Mason would meet with a person designated by the bookmaker either to receive from that person his winnings or to pay to that person his losings. In the course of this investigation Special Agent Mason traditionally met with one person whom the bookmaker had designated. On Monday, May 8, 1978, Special Agent Mason received a telephone call from the person he understood to be the bookmaker and was told that on the following night he would be met by a person other than his usual contact and that the person would approach him at a card game in which he participated on a weekly basis and identi-

fy himself as Marvin. On Tuesday evening, May 9, 1978, Special Agent Mason was approached by a man who identified himself as Marvin. Special Agent Mason gave Marvin $550 in cash. There was no conversation at that time which identified the reason for payment. Special Agent Mason testified that the sum represented a lost bet of $500 plus the bookmaker's ten percent 'juice' or commission. The applicant, who acknowledged having received the money at the card game, testified that it was his understanding that Special Agent Mason had borrowed money from a friend of his and that the loan was being repaid through him.

6. During September 1978, the Internal Revenue Service of the United States caused to be issued a search warrant authorizing the search of a sporting goods store in Phoenix, Arizona. The search warrant was served on Saturday, September 23, 1978. By September 23, 1978, Special Agent Mason had determined that the full name of the person to whom he had given the $550 on May 9, 1978, was Marvin S. Leff. He had not, however, seen Marvin S. Leff since May 9, 1978. Special Agent Mason was not present at the sporting goods store when the search commenced during the morning of September 23, 1978. During the search he received a telephone call advising him that Marvin S. Leff was on his way to the store, and he then proceeded to the sporting goods store where the search was being conducted. Special Agent Mason arrived at the sporting goods store just before the applicant Marvin S. Leff arrived. When the applicant Marvin S. Leff arrived at the sporting goods store where the search was being conducted, he was informed that he was the subject of an investigation and advised of his 'Miranda Rights' by a special agent of the Internal Revenue Service, who cited the Internal Revenue Code Section under which the investigation was being conducted. Applicant was then interrogated concerning his involvement, if any. He disclaimed any involvement in gambling. He informed the special agents of the Internal Revenue Service that he had received a telephone call from the owner of the store requesting that he come to the store. He was asked if he was admitted to practice law, and he stated that although he was admitted to practice law in the State of Illinois he was not admitted in the State of Arizona. He was not arrested and was not detained at the store.

7. On November 6, 1978, a subpoena was issued to compel the appearance of the applicant Marvin S. Leff before a Federal Grand Jury sitting in Arizona. The subpoena was given to a United States Marshal for service upon the applicant Marvin S. Leff. Service of the subpoena was in fact not made, but the applicant learned of its existence and telephoned Assistant United States Attorney Kenneth L. Fields. During that conversation the applicant informed Mr. Fields that, if he was required to appear before the Grand Jury, he would assert his Fifth Amendment right against self–incrimination. Upon learning this, Mr. Fields informed the applicant Marvin S. Leff that he need not appear before the Grand Jury.

8. No indictments were returned by the Grand Jury as a result of the Internal Revenue Service undercover investigation, and the applicant Marvin S. Leff heard nothing further from either the Internal Revenue Service or the United States Attorney's office.

9. Based upon the foregoing, the Committee finds that the applicant Marvin S. Leff was and knew himself to be the 'subject of an investigation concerning the violation of any felony or misdemeanor' and as such had a duty of disclosure to the Committee. The Committee further finds that the applicant made an intentional decision not to disclose the fact of his interrogation by the special agents of the Internal Revenue Service on September 23, 1978, when he filed his Statement of Material Changes in Application for Admission on February 14, 1979.

## DECISION

Based upon the foregoing findings, the Committee on Character and Fitness of the Supreme Court of Arizona is unable to make a finding that the applicant is of good moral character, which finding is a prerequisite to its recommendation of the applicant for admission to the State Bar of Arizona."

After examining the testimony upon which the Committee's recommendation was based, we particularly note two matters. First, that at a hearing on the 15th day of September, 1979, in response to this question from a member of the Committee: "Did you then consciously decide for those reasons you would not divulge this incident to the Committee on Character and Fitness?", the appellant answered, "Yes." Palpably, Leff intentionally withheld information from the Committee.

Second, we note the testimony before the Committee of Leff concerning his failure to testify before the Grand Jury:

"Q. Did you then undertake to contact the U.S. Attorney?

A. Yes, I did.

Q. Who did you call?

A. I called and asked for U.S. Attorney Fields.

Q. Did you speak to him?

A. Yes, I did.

Q. And tell us as best you recall, what occurred during that telephone conversation?

A. I called him and I identified myself. And I said, 'I understand that in relation to The Matter of Zimner that the U.S. Marshal has a Grand Jury Subpoena to serve me,' and that I did not desire to testify.

He asked me why. And I said if I was called to testify I intended to invoke the Fifth Amendment privilege against self-incrimination. He said, 'If that's your intention don't bother to show up.'"

He further testified:

"But I didn't want to raise the attorney/client privilege because I didn't know whether it really applied. And the last thing in the world that I wanted to do was to have any implication that I am practicing law in Arizona while I am trying to get admitted to the State of Arizona.

So I didn't want to raise the privilege. I didn't want to tell them that that would be the basis for not testifying. And on the other hand I was concerned about testifying because the questions were going to relate specifically to Coleman's and Zimner's disclosures to me."

It is apparent that rather than test the asserted attorney–client relationship before the Grand Jury, applicant preferred to deceive the United States District Attorney, thereby impeding the investigation into the asserted criminal activities of his two friends.

We conclude not only has Leff failed to establish his good moral character, but that it has affirmatively been shown that he does not have the requisite good moral character required for admission to the Arizona State Bar.

The application of Marvin S. Leff for admission to the Arizona State Bar is ordered denied.

HOLOHAN, V. C. J., and HAYS, CAMERON and GORDON, JJ., concur.