539 P.2d 891
**Application of William George WALKER for Admission to the State Bar of Arizona.**
**No. SB–59.**

Supreme Court of Arizona,
In Banc.
Sept. 9, 1975.

Bilby, Thompson, Shoenhair & Warnock, by Michael Lacagnina, Tucson, for petitioner.

Donald Daughton, Phoenix, for Committee on Examinations and Admissions.

PER CURIAM.

This is an original application by William George Walker for admission to the State Bar of Arizona. Although Walker successfully completed the written examination, the State Bar Committee on Examinations and Admissions, with one member disagreeing, refused to certify him for admission to the practice of law. The failure to certify Walker as qualified to practice law is predicated upon the decision in Application of Levine, 97 Ariz. 88, 397 P.2d 205 (1964), where this Court held that if there is doubt as to whether an applicant has established his good moral character, it is the duty of the Committee to refuse certification. It is our conclusion that Walker has such a serious defect in character as to preclude his admission to the State Bar of Arizona.

Walker was born on November 17, 1946. By the Universal Military Training and Service Act, U.S.C. Title I, § 1, 62 Stat. 604 (June, 1948), every male citizen between the ages of eighteen and twenty-six is required to report to his local Selective Service Board and register for the military draft. Those under the age of eighteen are required to register within five days after they reach their eighteenth birthday. The failure to register is a felony. Walker did not register within five days after his eighteenth birthday on November 17, 1964. He registered September 22, 1972, seven years and ten months thereafter, about two months before his twenty-sixth birthday. While there was other evidence received by the Committee, the following is in the main abstracted from Walker's own testimony given July 26, 1974.

Walker's father was an Army officer, a lawyer in the Judge Advocate General Corps, who was stationed for some years prior to 1964 at Fort Huachuca in Arizona. In 1964, Walker completed his high school education at Buena High School in Sierra Vista, near Fort Huachuca; his father retired from the service in July of that year and moved to Carlsbad, New Mexico. In the fall, Walker enrolled at Arizona State University in Tempe, near Phoenix. At the time of his enrollment, he was seventeen and about nine months. He testified:

" * * * when I became of age, to register for the draft, my 18th birthday [November 17, 1964], it never dawned on me that I at that time had an affirmative duty to go down somewhere and actually sign some sort of document to open myself up for the draft. * * *

* * * the reason that I didn't register is simply that I didn't realize I had an obligation to go somewhere and actually register or sign any papers."

In response to the question as to when did he realize that he had an affirmative duty to register, he testified:

"I got in some discussions with people who were friends of mine. And I learned that I did have a duty to register upon my 18th birthday. * * * I think it was shortly after I reached age 19."

This was either at the end of Walker's third semester, or the beginning of his fourth semester at Arizona State University, late in 1965 or early in 1966.

Walker attributes his failure to then register to the fact that "I was having some severe psychological problems.", stating that he wasn't ready for the responsibility of leaving home; that he was receiving poor grades at Arizona State University; that his father was very strict and he was afraid to tell his father about his grades.

He told the Committee:

"What happened was this. The draft problem simply became a part of a much bigger problem that I had. * * * One semester, for example, I didn't pay my dorm rent until almost the end of the semester when they threatened to kick me out, because the money I saved for my dorm I squandered away at the beginning of the semester. I just didn't have it. And it was simply a part of a huge problem."

Some time in his third year at Arizona State University, either in the month of January or February, Walker's father visited him at school and found out his exact situation with respect to his school work, but Walker did not tell his father of his failure to register for the draft. Walker's father had been offered a part-time job in Flagstaff at Northern Arizona University. He accepted that job and moved his family to Flagstaff, enrolled Walker at Northern Arizona University in Flagstaff, and thereafter Walker lived at home. While attending Northern Arizona University, Walker made the dean's list every semester; his grades improved almost immediately. When asked the question, why didn't you then go down and register, he answered:

"I'm not sure actually why I didn't. * * * I kept telling myself that I was going to do something about it, that I just wanted to get myself settled, that I just wanted to get some good grades here and to start doing things right. And then that I would do something about it. * * * I guess I emotionally wasn't quite ready to do anything about it yet. That's as good an answer as I can give."

After graduating from Northern Arizona University, Walker pursued graduate school study for a year at the University of Southern California and the following year registered at the law school of the University of Arizona in Tucson. He testified:

"To tell you the truth, I honestly didn't think much about my draft problem my first year of law school. * * * I sort of had a mental block about it. I just didn't think about it ever."

And:

"And it was the first time after my first year of law school that I actually started thinking about my future. * * * And in reviewing everything I was able to at least half way sort of face the draft problem and realize that something had to be done about it."

The evidence is susceptible of the construction that at this time Walker was aware that an application for the admission to the Arizona State Bar required the listing of his draft number and board.

During the fall of his second year of law school he decided that he had to talk to someone and made an appointment with Charles E. Ares, Dean of the Law School, and:

"* * * I indicated to him that I had to solve the problem. And that I wanted to register, but that I didn't know how. And that I didn't know what I should do at this point.

I didn't want to simply present myself down at the draft board. I had no idea what would happen to me."

Dean Ares recommended that he see Edward Morgan, a lawyer in Tucson, who was the only person he knew "that did this sort of draft counseling." Walker knew of the 1970 decision of the United States Supreme Court, *Toussie v. United States,* 397 U.S. 112, 90 S.Ct. 858, 25 L.Ed.2d 156 (1970), since the time of his graduate school study at the University of Southern California. It was there held that the general five-year statute of limitations applicable to prosecutions for failure to register began to run five days after a male citizen's eighteenth birthday.

Some time in January or February, perhaps in March of 1972, two, three or four months later, Walker arranged an appointment with Morgan, who advised him that he had never handled anyone who was quite as late in registering. Morgan then, in Walker's presence, called William G. Smith, an attorney in Los Angeles who specialized in matters of this nature. Walker stated that at this telephone conversation he was advised that Smith didn't think it was necessary for Walker to see him immediately. Five or six months later, in August of 1972, Walker arranged his first meeting in Los Angeles with Smith. He testified:

"He asked me if I would be willing to offer myself for induction into the Army

and to spend four years. I said quite frankly I was reluctant to do that, but I would do it if it were necessary to do it. * * * *Necessary to avoid prosecution.* But he also told me * * * that there had been a statute passed that made it a continuing offense to fail to register. * * * so that my failure to register after 23, or after 1970, was subject to the new statute, . . .." [Emphasis supplied]

Walker next saw Smith in Los Angeles on the 22nd day of September 1972. Smith explained to Walker that he had two alternatives. First, that he should not wait to be drafted and should not wait for a prosecution based on the congressional enactment of 1971, but should offer himself for induction into the service for four years; that this would forestall any prosecution and that he would never have an arrest record. Or, second, that he would simply register for the draft and not offer himself for immediate induction. In that event, Walker might be arrested and might be prosecuted; or if he wasn't prosecuted, he might be drafted. It was concluded, although Walker's domicile was in Arizona, that the Selective Service Law did not require a permanent residence at the place of registration. It required simply that a registrant be living at the place where he registered. Walker, who was staying with a friend at Pasadena, registered the same day in Pasadena. When he returned to Arizona a few days later, he informed his draft board of his Arizona address.

Walker received a card within possibly three weeks which gave his classification as 1H. This was a holding classification which had originated some time within the previous four to six months. It meant that because of the withdrawal from Vietnam, the various Selective Service Boards were holding large groups of persons without processing who might at some time in the future be classified to an active status.

Shortly after Walker reached his twenty-sixth birthday, about two months later, he received a letter from Smith stating that he had checked with Walker's draft board and that his file had been destroyed and there had been kept only a small microfilm card indicating the person, his number, the date of registration, the classification, and his birth date. Seemingly, after the twenty-sixth birthday of a registrant the draft board routinely destroyed a registrant's file when there were no indications of a prosecution. Walker testified:

"So he advised me that I had fully complied with all the Selective Service laws now upon registration, and that I think the letter says, as a matter of fact, that I had no further duty toward the Selective Service people, that I didn't even have to carry my draft card with me anymore, since the file had been destroyed."

On February 27, 1973, about three months later, Walker filed an application for admission to the Arizona State Bar.

He testified concerning his draft record: "* * * *I felt that it was a product of immaturity, and I was ashamed of it, but I didn't think that it indicated anything about the person that I am now.*" [Emphasis supplied]

Good moral character is a prescribed qualification for admission to the practice of law in all of the fifty states as well as Puerto Rico and the District of Columbia, *Konigsberg v. State Bar of California*, 366 U.S. 36, 81 S.Ct. 997, 6 L.Ed.2d 105, footnote 4 (1960). It is an applicant's burden to establish his good moral character. *Application of Levine, supra; Application of Courtney*, 83 Ariz. 231, 319 P.2d 991 (1957); *In re Wilson*, 76 Ariz. 49, 258 P.2d 433 (1953).

We do not base this decision upon a want of good moral character because of Walker's initial failure to register for the draft, although felonious violation of law is alone sufficient to establish a want of good moral character. *See, e. g., Spears v. State Bar of California*, 211 Cal. 183, 294 P. 697, 72 A.L.R. 923 (1930). The felonious doing of what is forbidden or the felonious failure to do what is re-

quired is ordinarily considered immoral. Even an acquittal in a criminal action has been held not to be res judicata upon an inquiry to determine an applicant's character and fitness to become a member of the bar. *Application of Cassidy*, 268 App.Div. 282, 51 N.Y.S.2d 202 (1944), *rearg. den.* 270 App.Div. 1046, 63 N.Y.S.2d 840, *aff'd* 296 N.Y. 926, 72 N.E.2d 41 (1947). In passing, however, we observe that in light of Walker's background as the son of an Army officer, his explanation, which might be plausible if offered by another of a different social status in life, is inherently incredible.

It is to be acknowledged that young men of the age of eighteen often have serious emotional and psychological problems. But for Walker these problems were resolved either at the time of or shortly after his enrollment in Northern Arizona University. He was then nearly twenty-one. He was living at home. He was no longer receiving poor grades. His father was aware of his scholastic problems at Arizona State University. But Walker still did not comply with the law. His violation of the Selective Service Act continued for at least another five years after his asserted psychological problems were resolved. For this reason, we find that Walker did not act as a person of good moral character would, should, or ordinarily does.

The principle here applicable is set forth in the frequently quoted statement of the North Carolina Supreme Court:

"* * * 'Upright character' * * * is something more than an absence of bad character. * * * It means that he [an applicant for admission] must have conducted himself as a man of upright character ordinarily would, should, or does. Such character expresses itself not in negatives nor in following the line of least resistance, but quite often in the will to do the unpleasant thing if it is right, and the resolve not to do the pleasant thing if it is wrong." *In re Farmer*, 191 N.C. 235, 238, 131 S.E. 661, 663 (1926).

■ We do not agree with Walker that his criminal conduct is not indicative of the person that he is. Behavior of such long duration cannot be considered as a temporary aberration to be cancelled by the lapse of a few months time. It is not the foolish flouting of a law, but a long-continued disregard for what is law abiding. It declares that Walker does not have the will to do the unpleasant thing if it is right nor the resolve not to do the pleasant thing if it is wrong, and attests to the failure to comport with the attorney's supreme commitment to preserve and uphold the law.

■ There are other matters which reinforce our conclusion in this respect. At the conclusion of Walker's application for admission to the Arizona State Bar, he attested as follows:

"I have read the foregoing document and have answered all questions fully and frankly. The answers are complete and are true of my own knowledge."

Walker did not at any place in his application indicate his situation with reference to his draft registration. He answered "No" to question 23:

"Is there any other incident in your career, not hereinbefore referred to, having a bearing upon your character or fitness for admission to the bar?"

He testified in response to a question whether in candor he should have in answer to question 23 told of his failure to register:

"The biggest thing was that I did not think that it reflected upon me presently as a person."

and summarized his position later as:

"First of all because of the fact that I did not think that the past incident reflected on me as I sit here before the Committee today, and as I was when I filled out the application.

Secondly, because I knew that the Committee had been appraised [sic] of my failure to register * * *, thirdly,

on the advice of my attorney that I could properly answer the question no. And that I had fulfilled my legal responsibilities, and was, at least at that time, no longer, I thought, going to be prosecuted. For all these reasons. And again I would like to state that I should have answered the question yes."

Walker's first reason justifying his failure to disclose presented the Committee with this dilemma. If on the one hand Walker was concealing his past in order to gain admittance to the Arizona State Bar, then unmistakably he was lacking the good moral character essential to the practice of law. But if Walker honestly believed, having spent nearly the whole of his adult life criminally evading the laws of the United States, that his past was not a reflection upon the person he presently is, then he lacked the ingrained sense of moral judgment so necessary to advise and counsel others.

Walker's second reason requires a somewhat further enlargement of the record. A fellow student at the College of Law at the University of Arizona advised the Committee by letter of Walker's failure to register for the Selective Service, and he told Walker that such a letter had been sent to the Committee. The import of Walker's answer to the Committee is that since it knew from another source, there was no real reason for him to answer the question "fully and frankly."

Walker further justifies his failure to disclose with sophistic rationalizations. He was asked:

"Did you tell them the whole truth when you answered question 23 'No'?

A. * * * Well, I don't want to quibble with you technically * * * I think technically I could have answered the question no because it says, 'Is there any other incident in your career not hereinbefore referred to', and I referred, if you will look in the form, to my

Selective Service Number, I gave my number, I gave my date of birth, and I also—I think signed a waiver, allowing the board to look into my Selective Service records."

What Walker seems to be saying, even while acknowledging that it is quibbling, is that the Committee could have discovered the truth if it had followed up all the information which he had made available through the answers to other questions.

He also testified:

"Another way that I could have technically answered the question no, although I am not trying to use this as an excuse, is that the question says, 'Is there any other incident in your career.' And career, it seems to me, applies to a profession. And I really didn't have a profession at that time."

We view Walker's third reason for failing to advise the Committee in the same light as did the California Supreme Court in *Spears v. State Bar of California, supra,* 211 Cal. 183, 294 P. 697, 72 A.L.R. 928:

"This duty to make a full disclosure is an absolute duty, and a justification for a failure to perform it is not to be found in the excuse that an applicant has been advised by some person, no matter how high in official position that person may stand, that such disclosure is not necessary, * * *."

There is another matter to which we might not ordinarily attach any great significance.

To question 17(b) on Walker's bar application, "Have you ever been charged with, arrested or questioned regarding violation of any law?", he answered, "No."

In fact, while Walker was attending law school, on November 11, 1970, at about the age of 24, he received a traffic citation for failing to have a front licence plate. On June 12, 1970, he received a ticket for run-

**140**

ning a red light, in September of 1971 he received a second ticket for running a red light, and in January of 1972 he received a third ticket for a similar offense. While the record is not entirely clear, in the first three incidents he appeared in the Tucson Traffic Court and pled not guilty but did not appear at the time set for trial. Arrest warrants were issued for failure to appear. Walker was not arrested because he was told by a roommate that a police officer had come to their apartment looking for him. He then went to the Tucson Traffic Court, seemingly pled guilty, and paid the fines imposed.

Walker testified concerning these incidents:

"It was not anything that, that was important that I thought had any bearing whatsoever."

When he was asked why he did not answer yes to question 17(b), his answer was:

"I didn't think that the incident had a bearing on my character or fitness for admission to the bar."

The pattern of Walker's behavior here was similar to that of his failure to register. In both matters his reasons for nondisclosure to the Committee were the same, in effect, that neither had a bearing on his fitness to practice law.

We are of the opinion that the failure to disclose cannot be treated as a simple failure to be candid with the Committee. In its best light it is an unwillingness to do the unpleasant thing if it is right, even to acknowledging past transgressions. In its worst, it is an evasion of both moral and legal responsibilities.

We hold that Walker has failed to establish the good moral character necessary for admittance to the practice of law in Arizona.

The application of William George Walker for admission to the Arizona State Bar is ordered denied.