SUPREME COURT OF ARIZONA
En Banc

| | | |
|---|---|---|
| In the Matter of | ) | Arizona Supreme Court |
| | ) | No. SB-04-0079-M |
| JAMES JOSEPH HAMM, | ) | |
| | ) | **O P I N I O N** |
| _____ Applicant.) | | |

**APPLICATION DENIED**

_____

JAMES JOSEPH HAMM                                          Tempe
In Propria Persona

MONROE & McDONOUGH, P.C.                                   Tucson
     By   Lawrence McDonough
And
JUAN PEREZ-MEDRANO, Chair                                  Phoenix
Attorneys for the Committee on Character & Fitness

CHARLES W. WIRKEN, President                               Phoenix
HELEN PERRY GRIMWOOD, President-elect                       Phoenix
JIM D. SMITH, First Vice President                         Phoenix
DANIEL J. McAULIFFE, Second Vice President                 Phoenix
EDWARD F. NOVAK, Secretary-Treasurer                       Phoenix
ROBERT B. VAN WYCK, Chief Bar Counsel                      Phoenix
Attorneys for Amicus Curiae
State Bar of Arizona

MICHAEL D. KIMERER                                         Phoenix
MARTY LIEBERMAN                                            Phoenix
AMY L. NGUYEN                                              Phoenix
CARLA RYAN                                                  Tucson
ANDREW SILVERMAN                                            Tucson
Attorneys for Amicus Curiae
Arizona Attorneys for Criminal Justice

ANDREW P. THOMAS, MARICOPA COUNTY ATTORNEY                 Phoenix
     By   Andrew P. Thomas
Attorney for Amicus Curiae Maricopa County Attorney's Office

_____

M c G R E G O R, Chief Justice

¶1        James Hamm petitioned this Court, pursuant to Arizona

Supreme Court Rule 36(g), 17A A.R.S.,[1] to review the recommendation of the Committee on Character and Fitness (the Committee) that his application for admission to the State Bar of Arizona (the Bar) be denied. Having reviewed the record and the Committee's report, we conclude that James Hamm has failed to establish the good moral character necessary to be admitted to the practice of law in Arizona and deny his application.

**I.**

¶2        In September 1974, James Hamm was twenty-six years old and living on the streets of Tucson. Although he previously had attended divinity school and worked as a part-time pastor, Hamm describes his life in 1974 as reflecting a series of personal and social failures. In 1973, he had separated from his wife, with whom he had a son. Although he had no criminal record, he supported himself by selling small quantities of marijuana and, again according to Hamm, he used marijuana and other drugs and abused alcohol.

¶3        On September 6, 1974, Hamm met two young men who identified themselves as college students from Missouri. The two, Willard Morley and Zane Staples, came to Tucson to buy twenty pounds of marijuana. Hamm agreed to sell it to them, but apparently was unable to acquire that quantity of marijuana.

---

[1]        References in this opinion to "Rule ___" are to the Rules of the Arizona Supreme Court.

Rather than call off the transaction, Hamm and two accomplices, Garland Wells and Bill Reeser, agreed to rob Staples and Morley of the money intended for the purchase. On September 7, Wells gave Hamm a gun to use during the robbery. Later that day, Wells and Hamm directed Morley and Staples to drive to the outskirts of Tucson, purportedly to complete the drug transaction; Reeser followed in another vehicle. Both Wells and Hamm carried guns; Morley and Staples were unarmed. Hamm sat behind Morley, the driver, and Wells sat behind Staples. At some point, Hamm detected that Staples was becoming suspicious. As Morley stopped the car, and without making any demand on the victims for money, Hamm shot Morley in the back of the head, killing him. At the same time, Wells shot Staples. Hamm then shot Staples in the back as he tried to escape and shot Morley once again. Wells also shot Morley, then pursued Staples, whom he ultimately killed outside of the car. Hamm and Wells took $1400.00 from the glove compartment, fled the scene in the van driven by Reeser, and left the bodies of Morley and Staples lying in the desert.

¶4        Hamm took his share of the money and visited his sister in California. At the hearing held to consider his application to the Bar, he told the Committee that he "was compelled to come back to Tucson," despite knowing he probably would be caught. Police officers arrested Hamm shortly after his return. While in custody, he told the police that Morley and Staples were killed

3

in a gun battle during the drug deal.  Initially charged with two counts of first-degree murder and two counts of armed robbery, Hamm pled guilty to one count of first-degree murder and was sentenced to life in prison, with no possibility of parole for twenty-five years.

¶5      Once in prison, Hamm began taking steps toward rehabilitation and became a model prisoner.  After spending one year in maximum security, he applied for and received a job in a computer training program that allowed him to be transferred to medium security.  Once in medium security, Hamm apparently took advantage of any and every educational opportunity the prison system had to offer.  He completed certificates in yoga and meditation and, on his own, studied Jungian psychology.  He helped fellow inmates learn to read and write and to take responsibility for their actions.  He obtained a bachelor's degree in applied sociology, *summa cum laude*, from Northern Arizona University through a prison study program.

¶6      After Hamm completed six years in medium security, prison officials transferred him to minimum security, where he worked on paint and construction crews.  He received a significant degree of freedom, which allowed him to live in a dormitory rather than in a cell and occasionally to drive unaccompanied to nearby towns.  He testified that he was the only inmate permitted to head a work crew.  Hamm reported to the

4

Committee that he played an instrumental role on various prison committees, particularly the committee that developed a new grievance procedure within the Department of Corrections. In addition, he wrote grant proposals for libraries, for handicapped prisoners, and for obtaining greater legal assistance for prisoners.

¶7     While in prison, he met and married Donna Leone. She and Hamm founded Middle Ground Prison Reform (Middle Ground), a prisoner and prisoner family advocacy organization involved in lobbying for laws related to the criminal justice system and prisons. Middle Ground also provides public education about those topics.

¶8     In 1989, the Governor, acting on the recommendation of the Arizona Board of Pardons and Parole (the Board), commuted Hamm's sentence. When he had served nearly seventeen years, in July 1992, the Board released Hamm on parole, conditioned upon no use of alcohol or drugs, drug and alcohol testing, and fifteen hours of community service each month. In December 2001, the Arizona Board of Executive Clemency[2] granted Hamm's third application for absolute discharge.

¶9     Between his release in August 1992 and his absolute discharge in December 2001, Hamm performed thousands of hours of

---

[2]     The Board of Pardons and Paroles is now the Arizona Board of Executive Clemency. 1993 Ariz. Sess. Laws, ch. 255, § 64.

community service.  He advocated for prisoners' rights in various forums by writing position papers, appearing on radio programs, testifying in legislative hearings, and speaking at churches, schools, and civic organizations.  He also appeared in a public service video encouraging children not to do drugs or join gangs. Hamm now works as the Director of Advocacy Services at Middle Ground Prison Reform.

¶10        While on parole, Hamm graduated from the Arizona State University College of Law.  In July 1999, Hamm passed the Arizona bar examination and, in 2004, filed his Character and Fitness Report with the Committee.

## II.

¶11        The Rules of the Supreme Court of Arizona establish the process through which the Committee and this Court evaluate applications for admission to the Bar, and prior case law clarifies the burden an applicant must satisfy to establish good moral character.  We begin with a review of the rules.

## A.

¶12        Rules 34 through 37 define the requirements for admission to the Bar.[3]  The Committee may recommend an applicant for admission only if that applicant, in addition to meeting

---

[3]        Amendments to Rules 32 through 40 became effective December 1, 2005.  Order Amending Rules 32-40, 46, 62, 64 & 65, Rules of Supreme Ct., Ariz. Sup. Ct. No. R-04-0032 (June 9, 2005).  In

other requirements, satisfies the Committee that he or she is of good moral character. Rule 34(a). The applicant bears the burden of establishing his or her good moral character. *In re Greenberg*, 126 Ariz. 290, 292, 614 P.2d 832, 834 (1980) (citing *In re Levine*, 97 Ariz. 88, 397 P.2d 205 (1964)). In determining whether an applicant's prior conduct indicates a lack of good moral character, the Committee must consider the following non-exhaustive list of factors:

A.  The applicant's age, experience and general level of sophistication at the time of the conduct
B.  The recency of the conduct
C.  The reliability of the information concerning the conduct
D.  The seriousness of the conduct
E.  Consideration given by the applicant to relevant laws, rules and responsibilities at the time of the conduct
F.  The factors underlying the conduct
G.  The cumulative effect of the conduct
H.  The evidence of rehabilitation
I.  The applicant's positive social contributions since the conduct
J.  The applicant's candor in the admissions process
K.  The materiality of any omissions or misrepresentations by the applicant.

Rule 36(a)3.

¶13     When prior conduct involves the commission of a violent crime, the Committee must, at a minimum, hold an informal hearing. Rule 36(a)4.E. If three or more Committee members who attended the hearing or who have read the entire record do not

_____

this opinion, we refer to the Rules effective when Hamm filed his

7

recommend admission of an applicant, the Committee must hold a formal hearing to consider whether to recommend the applicant for admission to the Bar. *Id.*

¶14    If the applicant fails to convince the Committee of his or her good moral character, the Committee has a *duty not to recommend* that person to this Court. *In re Klahr*, 102 Ariz. 529, 531, 433 P.2d 977, 979 (1967); *Levine*, 97 Ariz. at 91, 397 P.2d at 207 ("If the proof of good moral character falls short of convincing the Committee on Examinations and Admissions, it is its duty not to recommend admission."); *In re Courtney*, 83 Ariz. 231, 233, 319 P.2d 991, 993 (1957) ("In this it has no discretion; if the members entertain any reservations whatsoever as to the applicant's good moral character, it should not make a favorable recommendation to this court."). After the Committee submits its report, an aggrieved applicant may petition this Court for review. Rule 36(g).

**B.**

¶15    This Court then independently determines whether the applicant possesses good moral character and, based upon that determination, grants or denies the candidate's application. Although we give serious consideration to the facts as found by and the recommendation of the Committee, "[t]he ultimate decision in this difficult matter rests with the Supreme Court." *In re*

_____

application for admission to the practice of law.

*Kiser*, 107 Ariz. 326, 327, 487 P.2d 393, 394 (1971) (holding applicant possessed good moral character); *see also Levine*, 97 Ariz. at 92, 397 P.2d at 207 (holding the Court must, "using our independent judgment, de novo determine whether the necessary qualifications have been shown"). We do not limit our independent review to matters of law; we have "the ultimate responsibility for determination of fact and law." *In re Ronwin*, 139 Ariz. 576, 579, 680 P.2d 107, 110 (1983); *see also In re Walker*, 112 Ariz. 134, 137, 539 P.2d 891, 894 (1975) (making a finding regarding the credibility of testimony, although in agreement with the Committee).

¶16      The ultimate question in cases such as this is whether the applicant has established good moral character, a concept with which we have wrestled as we have attempted to define its boundaries. *Greenberg*, 126 Ariz. at 292, 614 P.2d at 834. As Hamm asserts, the rules and standards governing admission to the practice of law in Arizona include no *per se* disqualifications. Instead, we consider each case on its own merits. *Id*. In *Walker*, we described the principles on which we rely as follows:

> 'Upright character' * * * is something more than an absence of bad character. * * * It means that he [an applicant for admission] must have conducted himself as a man of upright character ordinarily would, should, or does. Such character expresses itself not in negatives nor in following the line of least resistance, but quite often in the will to do the unpleasant thing if it is right, and the resolve not to do the pleasant thing if it is wrong.

9

112 Ariz. at 138, 539 P.2d at 895 (alteration in original) (quoting *In re Farmer*, 131 S.E. 661, 663 (N.C. 1926)).

¶17    We also agree with Hamm that, under the Rule applicable to Hamm's application, our concern must be with the applicant's present moral character.  In *Greenberg*, we explained that "it is [the applicant's] moral character as of now with which we are concerned."  126 Ariz. at 292, 614 P.2d at 834; *see also* Rule 36(a)3.  Past misconduct, however, is not irrelevant.  Rather, this Court must determine what past bad acts reveal about an applicant's current character.

### III.

¶18    In compliance with Rule 36(a)4.E, the Committee conducted a formal hearing to consider Hamm's application.  The Committee heard testimony on May 20 and June 2, 2004.  Hamm, representing himself, and his wife presented extensive testimony.  In addition, the Committee heard from three licensed attorneys who had worked with Hamm and who recommended his admission and also considered letters from those opposed to and in support of Hamm's application.  In detailed findings, the Committee specifically considered the various factors set out in Rule 36(a) to determine Hamm's character and fitness to be admitted to the Bar.  In its report, the Committee stated that, in reaching its conclusions, it considered the following:

10

1) Hamm's unlawful conduct, which included the commission of two violent "execution style" murders and his testimony as to the facts surrounding the murders.
2) Hamm's omissions on his Application and his testimony in explaining his failure to disclose all required information.
3) Hamm's neglect of his financial responsibilities and/or violation of a longstanding child support court order and his testimony as to his failure to comply with the court order.
4) Hamm's mental or emotional instability impairing his ability to perform the functions of an attorney including his testimony as to any diagnosis and treatment.[4]

¶19    After reviewing all these factors, the Committee concluded that Hamm had not met his burden of establishing that he possesses the requisite character and fitness for admission to the Bar and accordingly recommended that his application be denied.  We now consider the Committee's findings, together with pertinent facts.

**A.**

¶20    The serious nature of Hamm's past criminal conduct is beyond dispute.  Hamm acknowledges that no more serious criminal conduct exists than committing first-degree murder.  Our society reserves its harshest punishment for those convicted of such conduct.  *See Tucson Rapid Transit Co. v. Rubiaz*, 21 Ariz. 221, 231, 187 P. 568, 572 (1920) (describing murder as "the most

---

[4]    The Committee was divided as to the significance of complaints made concerning Hamm's alleged unauthorized practice of law.  This Court's decision does not rely upon those allegations.

11

serious crime known to the law").

¶21     Hamm's past criminal conduct and the serious nature of that conduct affect the burden he must meet to establish good moral character.  He must first establish rehabilitation from prior criminal conduct, a requirement that adds to his burden of showing current good moral character.  *See In re Adams*, 540 S.E.2d 609, 610 (Ga. 2001) ("Where an applicant for admission to the bar has a criminal record, his or her burden of establishing present good moral character takes on the added weight of proving full and complete rehabilitation subsequent to conviction . . . ."); *In re Allan S.*, 387 A.2d 271, 275 (Md. 1978) ("Although a prior conviction is not conclusive of a lack of present good moral character, . . . it adds to his burden of establishing present good character by requiring convincing proof of his full and complete rehabilitation.").

¶22     The added burden becomes greater as past unlawful conduct becomes more serious.  In *In re Arrotta,* we considered an application for reinstatement from an attorney who, eight years earlier, pled guilty to mail fraud and bribery.  208 Ariz. 509, 96 P.3d 213 (2004).  We noted there that "the more serious the misconduct that led to disbarment, the more difficult is the applicant's task in showing rehabilitation."  *Id.* at 512 ¶ 12, 96 P.3d at 216.  An applicant for initial admission to the Bar who is attempting to overcome the negative implications of a serious

12

felony on his current moral character likewise must overcome a greater burden for more serious crimes. We agree with the New Jersey Supreme Court, which recognized that "in the case of extremely damning past misconduct, a showing of rehabilitation may be virtually impossible to make." *In re Matthews*, 462 A.2d 165, 176 (N.J. 1983). Indeed, we are aware of no instance in which a person convicted of first-degree murder has been admitted to the practice of law.

¶23     To show rehabilitation, Hamm must show that he has accepted responsibility for his criminal conduct. Hamm fully recognizes his need to make this showing. Indeed, he states that his rehabilitation could not have proceeded absent such acceptance. We recognize the Committee's concern that Hamm has not yet fully accepted responsibility for the two murders. Hamm *says* he has done so, repeatedly and strongly, but some of his other statements indicate to the contrary. The inconsistencies among his various statements related to accepting responsibility are most evident when he discusses Staples' murder. Although he *told* the Committee that he accepts responsibility for Staples' murder, in fact he consistently assigns that responsibility to his accomplice. His testimony revealed almost no attention to the commission or aftermath of Staples' murder. Hamm concedes that he has focused on his role in Morley's murder rather than on his role in Staples' murder. The difference in approach, he

13

explains, resulted from one postcard written to him by Morley's grandmother and his decision to use his connection to Morley to provide motivation to overcome difficulties. We have no reason to doubt that Hamm's focus on Morley's murder aided him, using his words, in "accomplishing things that people have been telling me I can't do and we're [Hamm and Morley] still doing it today." That fact, however, does nothing to assure us that Hamm has taken responsibility for Staples' murder, as he must if he is to establish rehabilitation.

¶24   We also give serious consideration to the Committee's finding that Hamm was not completely forthright in his testimony about the murders.[5] Hamm has insisted in his filings with this Court that he did not intend to kill, but only to rob, his victims. The agreed facts, however, lead directly to the inference that Hamm intended to kill. He conspired with his accomplices to rob the victims; he accepted the gun provided by Wells and took it with him in the car with the victims; he testified that, although he did not intend to kill the victims, he was "afraid" they would be killed when he got in the car; he shot Morley without ever attempting a robbery and shot him a second time to make certain he was dead; and he also shot Staples

---

[5]   Hamm's lack of candor on this question also impacts our analysis of whether he met his burden of showing present good moral character. *See* Section III, subsections B through E, *infra*.

14

to prevent his escape.  The Committee observed Hamm testify and was able to judge the credibility of his testimony in light of uncontested facts.  We agree that the record shows that Hamm, despite his current protestations to the contrary, intended to kill the victims.  His failure to confront the fact that these murders were intentional undermines his statements that he fully accepts responsibility for his actions.

¶25     As did the Committee, we give substantial weight to Hamm's attempts at rehabilitation.  In Section I, *supra*, we described in some detail the activities Hamm has undertaken, both while in and since his release from prison.  We are impressed with the sincerity and fervor of those who testified or submitted letters on Hamm's behalf.  Were rehabilitation the only showing Hamm must make to establish good moral character, we would weigh those factors tending to show rehabilitation against those tending to show a lack thereof.  Under the facts of this case, however, we need not decide whether the facts of record establish rehabilitation.

¶26     When an applicant has committed first-degree murder, a crime that demonstrates an extreme lack of good moral character, that applicant must make an extraordinary showing of present good moral character to establish that he or she is qualified to be admitted to the practice of law.  Even assuming that Hamm has established rehabilitation, showing rehabilitation from criminal

15

conduct does not, in itself, establish good moral character. Rehabilitation is a necessary, but not sufficient, ingredient of good moral character. An applicant must establish his current good moral character, independent of and in addition to, evidence of rehabilitation. We conclude that Hamm failed to make that showing.

**B.**

¶27    We share the Committee's deep concern about Hamm's longstanding failure to fulfill, or even address, his child support obligation to his son, born in 1969, four years before Hamm and his first wife separated. Not until he prepared his application for admission to the Bar in 2004 did Hamm make any effort to meet his responsibility to provide support for his son. During the Committee hearing, Hamm advanced several explanations for his failure to do so. Like the Committee, we find none of his explanations credible.

¶28    Although Hamm attempts to excuse his failure to pay child support by pointing out that he never received a copy of a final divorce decree, Hamm scarcely can claim that he lacked awareness of his obligation. A few months after he and his wife separated in 1973, Hamm was arrested on a misdemeanor charge of failing to pay child support. On May 6, 1974, James and Karen Hamm's divorce decree set Hamm's child support payments at $75.00 a month. Hamm made no effort to learn the extent of his

16

financial obligation to his son from 1974, when Hamm was twenty-six years old, until 2004, when he was fifty-five. During those nearly thirty years, he gained sophistication and attended law school. He must have known, and certainly should have known, that he had long avoided a basic parental obligation.[6]

¶29     Hamm also attempted to excuse his inattention to his obligation by explaining that he learned, first from a private investigator hired by his wife in 1988, and later from his son, that his former wife's new husband had adopted his son. His reliance on the private investigator's 1988 report to excuse his failure is surprising, given the fact that his son was only months from the age of majority when Hamm learned of the report; he provides no explanation for his lack of concern prior to that date.

¶30     Hamm further explained that only when he applied for admission to the Bar in 2004 did he discover that his son had not been adopted and then "calculated the child support payment [due] over the years." Hamm determined that he owed $10,000.00 and, even though the statute of limitations barred an action to

---

[6]     Hamm also cannot attribute his failure to pay child support to the absence of funds. Even while in prison, Hamm earned "somewhere around a hundred dollars a month probably," but used no portion of those earnings to discharge his obligation.

17

recover past amounts due,[7] contacted his son and set up a repayment schedule.

**¶31**     "Behavior of such long duration cannot be considered as a temporary aberration . . . ." *Walker*, 112 Ariz. at 138, 539 P.2d at 895; *see also Office of Disciplinary Counsel v. Lewis*, 426 A.2d 1138 (Pa. 1981) (holding that even when an attorney made belated restitution for funds taken from clients, because "[s]uch actions cannot be said to be consistent with high ethical standards of the profession, with a lawyer's fiduciary responsibility to his client, with a character that is beyond reproach, or with truth, candor and honesty," the attorney could

---

[7]     When asked if he had taken steps to formalize his agreement with his son to pay back child support, Hamm replied, "No.  No.  I simply acknowledged the debt regardless whether it is a legal debt or not and whether it's an enforceable debt or not."  In its findings, the Committee noted that Hamm "has since taken it upon himself to attempt to comply with his child support obligations," but expressed concern that he made no admission of a legal obligation to pay.    Whether an action to enforce Hamm's obligation to his son is in fact time-barred is unclear.  In *Huff v. Huff*, the Texas Supreme Court held that a ten-year statute of limitations under Tex. Rev. Civ. Stat. Ann. art. 5532, since repealed by Acts 1985, 69th Leg., ch. 959, § 9(1), eff. Sept. 1, 1985, applied to violations of child support orders.  648 S.W.2d 286, 287–88 (Tex. 1983) (allowing a claim based on a 1973 divorce decree).    Because Hamm's son turned eighteen in 1987, the ten-year statute of limitations expired in 1997.  In 2002, however, the Texas Supreme Court held that an administrative writ, created by constitutional amendment in 1997, could be used to enforce a divorce decree issued in 1974, for which no order was obtained, because the administrative writ is a "new and improved enforcement mechanism."  *In re A.D.*, 73 S.W.3d 244, 248 (Tex. 2002).  We need not resolve this question of Texas law, but share the Committee's concern over Hamm's failure to formally investigate his legal obligations to his son.

18

not continue to practice law). Hamm's failure to meet his parental obligation for nearly thirty years makes it more difficult for him to make the required extraordinary showing that he "has conducted himself as a man ordinarily would, should, or does." *Walker,* 112 Ariz. at 138, 539 P.2d at 895.

¶32     We also agree with the Committee that Hamm did not display honesty and candor in discussing his failure to pay child support with the Committee. Hamm testified both that his son told him personally that he had been adopted and that his son "adamantly refused" to accept interest payments on the unpaid child support.

¶33     Hamm's son testified, however, that he had never been adopted, that prior to his contact with Hamm he had changed his name himself, and that he had not told Hamm he had been adopted. Hamm's son also did not report adamantly refusing interest payments. In response to a question from the Committee about interest payments, he said:

> Discussions about interest? Seems like whenever we were talking about it, you know, he said it was a large amount, and it seems like the subject of interest did come up. I can't remember exactly, you know, what we said about it. But, you know, I didn't push the issue or anything, say, well, you know, you're going to pay me interest for this or what, or is there any interest. It wasn't really an issue or important to me.

¶34     We discern no reason that Hamm's son would have been other than forthright about these matters, while Hamm had every

19

reason to present himself in the best possible light.[8]  Like the Committee, we find the testimony of his son to be more credible.

## C.

¶35     We further conclude that Hamm did not adequately explain his failure to disclose an incident involving him and his current wife, Donna, when he submitted his application to the Committee.

¶36     In 1996, Hamm and Donna engaged in a physical altercation outside a convenience store.  Donna "yelled the word 'kidnap' out of the window" of the vehicle Hamm was driving, causing him to pull over and leave the vehicle.  During their tussle, Donna tore Hamm's shirt.  Both called the police, who arrested neither Hamm nor Donna.  The incident and what Donna describes as her "embellishments" caused such great concern to the Hamms, particularly because Hamm was on parole, that Donna submitted to a polygraph administered by a private company to demonstrate that Hamm had not kidnapped her.  The two also underwent marital counseling.

¶37     Nonetheless, when filling out his Character and Fitness

---

[8]     Rather than acknowledge any inconsistencies between his testimony and that of his son, Hamm lashed out at the Committee's refusal to agree with Hamm's argument, which the Committee could accept only if it accepted Hamm's testimony on this issue as credible.  Hamm accused the Committee of "totally ignor[ing] the content of [Hamm's Petition] to which it supposedly was responding."

Report, Hamm failed to disclose the incident to the Committee. Question 25 on the report asks specifically whether the applicant, among other things, has been "questioned" concerning any felony or misdemeanor.[9] Hamm told the Committee that, in reading the application, he missed the word "questioned" in the list of encounters with law enforcement that Question 25 directs an applicant to report.

¶38 Hamm's explanation strains credulity. In *Walker*, this Court inferred that the son of an Army officer would understand the requirement to register for the draft. 112 Ariz. at 138, 539 P.2d at 895. Likewise, we infer from Hamm's knowledge of the law and his efforts in 1996 to document a defense for the domestic incident that he fully understood its importance and must have known that the incident would be of interest to the Committee. His failure to include it in his initial application further affects his ability to make the needed extraordinary showing of good moral character.

---

[9] Question 25 asks:

> Have you either as an adult or a juvenile, ever been served with a criminal summons, questioned, arrested, taken into custody, indicted, charged with, tried for, pleaded guilty to or been convicted of, or ever been the subject of an investigation concerning the violation of, any felony or misdemeanor? (In answering this question, include all incidents, no matter how trivial or minor the infraction or whether guilty or not, whether expunged or not, whether you believe or

21

¶39      Hamm's actions during these proceedings also raise questions about his fitness to practice law.  The introduction to Hamm's petition before this Court begins:

> The consequences of this case for Petitioner take it out of the ordinary realm of civil cases.  If the Committee's recommendation is followed, it will prevent him from earning a living through practicing law.  This deprivation has consequences of the greatest import for Petitioner, who has invested years of study and a great deal of financial resources in preparing to be a lawyer . . . .

This language repeats nearly verbatim the language of the United States Supreme Court in *Konigsberg v. State Bar*, 353 U.S. 252 (1957), in which the Court wrote:

> While this is not a criminal case, its consequences for Konigsberg take it out of the ordinary run of civil cases. The Committee's action prevents him from earning a living by practicing law. This deprivation has grave consequences for a man who has spent years of study and a great deal of money in preparing to be a lawyer.

*Id.* at 257–58.  If an attorney submits work to a court that is not his own, his actions may violate the rules of professional conduct.  *Iowa Supreme Court Bd. of Prof'l Ethics & Conduct v. Lane*, 642 N.W.2d 296, 299 (Iowa 2002) ("[P]lagiarism constitute[s], among other things, a misrepresentation to the court.  An attorney may not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation."); *see also* Rule

---

       were advised that you need not disclose any such instance.)

22

42, ER 8.4(c) (defining professional misconduct as including "engag[ing] in conduct involving dishonesty, fraud, deceit or misrepresentation"). We are concerned about Hamm's decision to quote from the Supreme Court's opinion without attribution and are equally troubled by his failure to acknowledge his error. When the Committee's response pointed to Hamm's failure to attribute this language to *Konigsberg*, he avoided the serious questions raised and refused to confront or apologize for his improper actions, asserting instead: "From Petitioner's perspective, any eloquence that might be found in the Petition does not derive from any prior case decided in any jurisdiction, but rather from the gradual development of his own potential through study, reflection, and devotion to the duty created by his commission of murder." Hamm apparently either does not regard his actions as improper or simply refuses to take responsibility. In either case, his actions here do not assist him in making the requisite showing of good moral character.[10]

---

[10] In addition to the matters discussed above, only four years have passed since James Hamm was absolutely discharged. The fact that Hamm has been free of supervision for this relatively short time weighs against his admission to the practice of law. *Greenberg*, 126 Ariz. at 293, 614 P.2d at 835 (noting that "[r]ehabilitation is seldom accomplished in an instantaneous fashion" and holding that Greenberg had "not convinced [the Court] that *he as yet evidences* the requisite good moral character")(emphasis added); *see also In re Dortch*, 860 A.2d 346, 348 (D.C. 2004) (finding it "would be erosive of public confidence in the legal profession and the administration of justice were we to admit an applicant who is still on parole for

¶40     When Hamm committed first-degree murder in 1974, he demonstrated his extreme lack of good moral character.  Although this Court has not adopted a *per se* rule excluding an applicant whose past includes such serious criminal misconduct, we agree with those jurisdictions that have held that an applicant with such a background must make an extraordinary showing of rehabilitation and present good moral character to be admitted to the practice of law.  Perhaps such a showing is, in practical terms, a near impossibility.  We need not decide that question today, however, because Hamm's lack of candor before the Committee and this Court, his failure to accept full responsibility for his serious criminal misconduct, and his failure to accept or fulfill, on a timely basis, his parental obligation of support for his son, all show that Hamm has not met the stringent standard that applies to an applicant in his position who seeks to show his present good moral character.

**IV.**

¶41     Hamm asserts that he was denied due process of law because two members of the Committee may have prejudged the merits of his application.  Both members, however, left the Committee proceedings when their potential bias came to light,

---

crimes as serious as those committed by Dortch").  Because Hamm otherwise failed to establish good moral character, however, we

and neither played any role in the Committee's findings and recommendation.

¶42    Hamm, like all applicants for membership in the Bar, is entitled to receive due process of law. "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). Also, "due process requires that a party be given a 'fair trial in a fair tribunal.'" *United States v. Superior Court*, 144 Ariz. 265, 280, 697 P.2d 658, 673 (1985) (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)). Both the Committee and this Court have provided Hamm ample opportunity to be heard through hearings and written arguments. Moreover, this Court, and not the Committee, made the ultimate decision on Hamm's application. Hamm received a full opportunity to be heard before a fair tribunal.

---

reached our decision without considering this factor.

**V.**

¶**43**    Because James Hamm has failed to meet his burden of proving that he is of good moral character, we deny his application for admission to the State Bar of Arizona.

_____
                Ruth V. McGregor, Chief Justice

CONCURRING:

_____
Michael D. Ryan, Justice

_____
Andrew D. Hurwitz, Justice

_____
W. Scott Bales, Justice

_____
Jefferson L. Lankford, Judge*

---

\*    The Honorable Rebecca White Berch recused herself; pursuant to Article VI, Section 3 of the Arizona Constitution, the Honorable Jefferson L. Lankford, Judge of the Court of Appeals, Division One was designated to sit in her stead.