HURWITZ, Justice,
dissenting.
¶30 The State Bar of Arizona has repeatedly urged us to disqualify from the practice of law all applicants with records of serious past misconduct. Such a bright-line rule would hardly be irrational. Felony convictions disqualify applicants from participation in a number of other professions, *568 including law enforcement, Ariz.Rev.Stat. (“A.R.S.”) § 13-904(F) (2001), certified public accounting, A.R.S. § 32-741(A)(l) (2002), nursing, A.R.S. § 32-1632(2) (Supp.2005), private investigation, A.R.S. § 32-2422(A)(3) (2002), and security, A.R.S. § 32-2612(A)(3) (2002).
¶ 31 Our opinions, however, have twice expressly rejected the Bar’s suggested per se approach.[17] In In re Hamm, we stated that “the rules and standards governing admission to the practice of law in Arizona include no per se disqualifications” and that we therefore “consider each case on its own merits.” 211 Ariz. 458, 462 ¶16, 123 P.3d 652, 656 (2005). I concurred in that holding, which is entirely consistent with our willingness to consider the readmission of attorneys disbarred after felony convictions upon proof of rehabilitation. See In re Arrotta, 208 Ariz. 509, 96 P.3d 213 (2004) (involving reinstatement application of attorney convicted of mail fraud and bribery). I also concurred in the Court’s conclusion that despite his admirable post-conviction record, Mr. Hamm had not discharged his difficult burden of demonstrating current good moral character. Hamm, 211 Ariz. at 468 ¶ 40, 123 P.3d at 662.
¶ 32 The majority purports again to reject a per se rule today, stating that, notwithstanding serious past misconduct, an applicant can prove the current good moral character required by Arizona Supreme Court Rule 36[18] for admission to the Bar. Op. ¶ 9 & n. 8. In practice, however, the Court has adopted the very bright-line rule it purports to abjure. If Mr. King has not demonstrated rehabilitation and current good moral character, it is difficult for me to conclude that any applicant previously convicted of a serious felony ever can.
I.
¶33 The majority accurately recites the background facts of this ease, Op. ¶¶ 2-7, and I need not recount them here. But several uneontested facts not emphasized in the majority opinion deserve particular focus.
¶ 34 Mr. King comes to us with an extraordinary item on his resume — he is a longstanding member of the Texas Bar. King graduated from law school, took and passed the Texas Bar examination in 1994, and was admitted to practice after a formal hearing before the Texas Board of Law Examiners. Under Texas law, his admission necessarily involved a finding that he was then of good moral character. See Tex. Rules Governing Admission to the Bar, Rule IV(f)(2) (West, Westlaw through 2006) (requiring that an applicant with a felony conviction demonstrate current good moral character as a prerequisite to admission).
¶ 35 While we are of course not bound by another state’s determination that an applicant possesses good moral character, neither should we simply disregard such a finding.[19] More importantly, the years since 1994 strongly bear out the wisdom of Texas’s conclusion. Mr. King worked for several firms in Texas from 1994 to 2003, specializing in personal injury law. He is in good standing with the Texas Bar and has never been the subject of a disciplinary grievance or sanction. King belongs to an Inn of Court, an organization emphasizing professionalism and ethics among lawyers. He has worked as a paralegal since coming to Arizona and receives high praise from his employers.
¶36 Nor is there a single blemish on King’s personal record. King has had no serious difficulties with the law since 1977. *569 Indeed, he appears to have been a model citizen in the almost thirty years following his crime. He is a devoted family man, happily married and successfully raising three children. He is active in his children’s Boy Scout groups and the Chandler Christian Church, where he is involved with a number of leadership groups and charitable programs. He was similarly active in his church in Texas for an extended period of time.
¶ 37 King’s application is supported by some fifty letters of recommendation, each of which praises King’s good moral character and good works. These letters come from peers, colleagues, supervisors, friends, clients, professors, clergymen, judges, and lawyers.[20] The letters of recommendation are uniformly supportive of King’s application, some in glowing terms. No one appeared before the Committee or submitted a letter opposing King’s admission. King also presented compelling character testimony at the Committee hearings. Peter William Murphy, a professor at the South Texas College of Law, defense counsel for the International Criminal Tribunal, former trustee for the American Inns of Court, and former teacher and moot court coach to King, testified that King’s rehabilitation from his past crime was like nothing he had ever seen. Professor Murphy unreservedly recommended King to the practice of law, explaining that he believed King to possess the requisite good moral character and fitness.
¶38 Perhaps most telling is that, after considering all of this evidence at a formal hearing, our Committee on Character and Fitness (“Committee”) recommended King in April 2005 for admission to the State Bar. The Committee did so after hearing from King personally on two occasions; its recommendation is therefore obviously based on a determination that King was credible and had established his rehabilitation. “[W]e give serious consideration to the facts as found by and the recommendations of the Committee.” Hamm, 211 Ariz. at 462 ¶ 15, 123 P.3d at 656.[21]
II.
¶ 39 Notwithstanding this compelling and extraordinary record, the Court nonetheless concludes that Mr. King is not fit to practice law in Arizona. It does so not because it concludes that he currently lacks good moral character, but rather because it believes that King has not sufficiently demonstrated rehabilitation from his 1977 crime. I respectfully disagree.
A.
¶ 40 The majority denies Mr. King admission to the Bar because he has fallen “short of the ‘virtually impossible’ showing needed to erase the stain of his serious criminal conduct.” Op. ¶ 28. By making the required showing of rehabilitation “virtually impossible,” the majority pre-ordains the result. I do not believe, however, that our rules and case law support the application of the “virtually impossible” standard in this case.
¶41 We have long held that an applicant has the burden of establishing his qualifications to practice law. See, e.g., In re Green-berg, 126 Ariz. 290, 292, 614 P.2d 832, 834 (1980). Rule 36(a)(2)(A) provides that prior unlawful misconduct is relevant to the issue of the applicant’s current good moral character. Rule 36(a)(3) provides that in determining that character, various factors relating to prior misconduct, including its “recency,” *570 “seriousness,” and “evidence of rehabilitation,” should be taken into account. Our rule is thus properly read as requiring more convincing proof of rehabilitation the more serious the prior misconduct: “The added burden becomes greater as past unlawful conduct becomes more serious.” Hamm, 211 Ariz. at 464 ¶ 22, 123 P.3d at 658. But nothing in the language of the rule suggests that such a showing is, as the Court holds today, “virtually impossible” for all serious prior misconduct.
¶42 The “virtually impossible” language appears for the first time in our case law in Hamm. We correctly noted there that an applicant “who is attempting to overcome the negative implications of a serious felony on his current moral character ... must overcome a greater burden for more serious crimes.” Id. We then agreed with a statement made by the New Jersey Supreme Court that “in the ease of extremely damning past misconduct, a showing of rehabilitation may be virtually impossible to make.” Id. (quoting In re Matthews, 94 N.J. 59, 462 A.2d 165, 176 (1983)).
¶ 43 It is important, however, to note that the applicant in Hamm had been convicted of the most serious crime recognized under Arizona law — first degree murder — the paradigm of “extremely damning past misconduct.” Because Hamm’s crime was the most serious our law recognizes, his burden of establishing good moral character was appropriately very difficult. Mr. King, however, was not convicted of first degree murder, but rather of attempted murder. Mr. Hamm killed two people; Mr. King injured two.[22] Our legislature has expressly recognized that attempted murder, while a serious offense, is much less “damning” misconduct than first degree murder. See A.R.S. § 13-1105(D) (Supp.2005) (classifying first degree murder as a class one felony punishable by death or life imprisonment); A.R.S. § 13-1001(C)(1) (2001) (classifying attempted murder as a class two felony); A.R.S. § 13-702(A) (Supp. 2005) (punishing a class two felony with four to ten years imprisonment). The laws of Texas, under which King was convicted, are similar. Conviction for the Texas equivalent of first degree murder results in either a death sentence or life imprisonment, Tex. Penal Code Ann. § 12.31(a) (West, Westlaw through 2005); attempted murder is normally punished by at least two years imprisonment, Tex. Penal Code Ann. § 12.33(a) (West, Westlaw through 2005), but can lead, as it did in Mr. King’s case, to probation after a brief period of shock incarceration, Tex.Code Crim. Proc. Ann. art. 42.12, § 3(a) (West, Westlaw through 2005).
¶ 44 The majority ignores these substantial distinctions between Mr. Hamm’s and Mr. King’s past misconduct, simply equating first degree murder with attempted murder as “extremely damning prior misconduct.” Op. ¶ 11. I do not believe that the “virtually impossible” test, which is in practice outcome-determinative, should be applied to all prior serious misconduct. Indeed, were that the case, we would not have considered the application for reinstatement in Arrotta from an applicant who had committed mail fraud and bribery. See 208 Ariz. at 512 ¶ 12, 96 P.3d at 216. Rather, I believe, as I thought the Court held in Hamm, that the quality of proof of rehabilitation should increase as the seriousness of prior misconduct increases. In Mr. King’s case, the appropriate burden, in light of his serious crimes, is not “virtual impossibility” but rather “an extraordinary showing of rehabilitation and present good moral character.” Hamm, 211 Ariz. at 468 ¶ 40, 123 P.3d at 662.
B.
¶ 45 Although Mr. King faced a difficult burden in establishing rehabilitation and good moral character, I conclude that he has discharged it. Rehabilitation, like good moral character, is not a concept susceptible to easy objective measurement. But surely the most compelling evidence of rehabilitation is the way that King has led his life since his criminal conduct and the first-hand observations of those with whom he has interacted during that period. Over the course of almost *571 three decades, Mr. King has lived his life in an exemplary fashion on both a personal and professional level, and this is attested to by scores of those with detailed knowledge of his actions. The record contains no evidence to the contrary.
1.
¶ 46 In concluding that Mr. King has failed to demonstrate rehabilitation, the Court first suggests that he has failed to take responsibility for his misconduct. I find no such evidence in this record. As the majority acknowledges, in the Committee hearings, “King admitted shooting the victims and expressed remorse, calling the shootings ‘a mistake I made that I will carry with me for the rest of my life.’ ” Op. ¶ 14. The Committee, which had the opportunity to observe and question Mr. King, obviously believed the sincerity of that statement.
¶ 47 The majority, however, discounts the Committee’s conclusion on several grounds, none of which I find persuasive. First, the majority suggests that in explaining, in a law school application in the early 1990s, why he pleaded guilty to one count of attempted murder, Mr. King somehow attempted to minimize his culpability for the crimes. Op. ¶ 15. Read in context, however, the statement in the application was simply a factual explication of the factors that went into a guilty plea — the lack of witnesses, his impaired memory of the event, the likely hostility of jurors to his actions, and the fact that the plea involved dismissal of one count of attempted murder. The application did not call for expressions of remorse, and I would not penalize Mr. King for not gratuitously offering them. Nothing in his explanation in the application, nor in subsequent descriptions Mr. King has given about his actions and the subsequent criminal justice proceedings, suggests to me that Mr. King is denying responsibility for his actions. He began to do so by admitting his guilt to the Texas court,[23] and has continued to do so repeatedly throughout his career since, most recently in his appearance before the Committee. Rather than parse a section of a law school application filed fifteen years ago for evidence of lack of remorse, I would rely on the Committee’s first-hand observations of the applicant within the last year.
¶48 Nor can I conclude that Mr. King’s impaired memory of the events of the fateful evening demonstrate either lack of candor or failure to accept responsibility. The arrest report makes clear that when apprehended, Mr. King was intoxicated to the point of incapacitation; he was so incoherent that the police officers were unable to read King his Miranda rights. Under these circumstances, his failure to recall every detail of the events is more a demonstration of honesty than evasion. The majority’s suggestion that Mr. King has “selective memory” is again in stark contrast to the conclusions of the Committee members who had the face-to-face opportunity to consider his credibility.
2.
¶49 The Court also concludes that Mr. King has failed to identify the weaknesses that caused his misconduct or address those weaknesses. Again, I am unable to agree.
V 50 Mr. King has consistently recognized that his misconduct was caused by a combination of alcohol abuse and job-related stress. The majority acknowledges this, but speculates that there was also a deeper “character flaw that led [King] to fail to appropriately cope with stress and/or to abuse alcohol” to which King has failed to admit. Op. ¶21. The majority condemns King for not submitting evidence from a mental health expert diagnosing this supposed character flaw and attesting to King’s triumph over it. Op. ¶ 22.
¶ 51 The record, however, indicates that King has undergone counseling, during both his probation and in the years since his absolute discharge, including personal, psychological and alcohol-related sessions. He has never been diagnosed as an alcoholic or as having a mental health condition requiring *572 further treatment. I therefore find no warrant for concluding that Mr. King has hidden some character flaw or disease from us or the Committee.
¶ 52 More importantly, Mr. King’s life since 1977 has conclusively demonstrated that he has triumphed over whatever demons led him to commit his crime. What better evidence can there be to prove an applicant has overcome a weakness than twenty-nine years of consistent, incident-free conduct in stressful situations? If Mr. King had a continuing problem with alcohol, surely there would have been some indication of this in the almost thirty years since his crime. If Mr. King had a continuing problem dealing with stress, surely there would have been some indication of this in his more than ten years of practicing personal injury law, a pursuit hardly free from stress.
III.
¶ 53 Our goal in ensuring that members of the Bar possess good moral character is to protect the public. See Matter of Shannon, 179 Ariz. 52, 77, 876 P.2d 548, 573 (1994). In this case, King’s spotless record as a practicing attorney, together with the glowing recommendations of his clients, colleagues, adversaries and judges before whom he has appeared, adequately assures us that the citizens of Arizona would be safe with King practicing law.
¶ 54 I therefore respectfully dissent from today’s opinion. I would accept the Committee’s recommendation and admit King to the practice of law. Although the Court today suggests that some hypothetical future candidate with a record of serious past misconduct might someday qualify for admission to the Bar, Op. ¶ 29, I wonder whether the public and future applicants would be better served by adopting the per se approach the majority opinion purportedly rejects. If Mr. King’s application cannot meet our “non per se” standards, I doubt that any ever will.

. We also rejected a per se approach in 2005 when we amended the Rules governing admission. Order Amending Rules 32-40, 46, 62, 64 & 65, Rules of Supreme Ct., Ariz. Sup.Ct. No. R-04-0032 (June 9, 2005).

. This dissent, like the Court’s opinion, refers to the version of the rules in effect at the time King filed his application for admission. Rules of the Supreme Court are cited as "Rule —.”

. The Court discounts the Texas admission, arguing that it "has no bearing on rehabilitation,” but rather only on the issue of King’s good moral character. Op. ¶ 24 n.13. Rule 36(a), however, makes plain that rehabilitation from past misconduct is a necessary component of present good moral character. Hamm is to the same effect, noting that "[rjehabilitation is a necessary but not sufficient, ingredient of good moral character.” 211 Ariz. at 465 V 26, 123 P.3d at 659. Thus, whatever the differences between Texas and Arizona law, the Texas finding of present good moral character at the very least suggests rehabilitation from past misconduct.

. See Kwasnik v. State Bar, 50 Cal.3d 1061, 269 Cal.Rptr. 749, 791 P.2d 319, 323 (1990) ("Traditionally we have accorded significant weight to testimonials submitted by attorneys and judges regarding an applicant’s moral fitness, on the assumption that such persons possess a keen sense of responsibility for the integrity of the legal profession.").

. The Committee had recommended denial of a previous application by King in 2003. The Court correctly does not rely on this previous denial today. King represented himself before the Committee on that prior occasion, and presented far less evidence than he did in 2005. Even on that lesser showing, the Committee seems to have concluded in 2003 that King had discharged his burden of demonstrating rehabilitation, finding "strong evidence of the Applicant's rehabilitation.” Rather, the 2003 denial seems to have been based on the "seriousness of the crimes” committed by King, an approach that is at odds with this Court’s rejection of a per se exclusionary rule in Hamm.

. When questioned by police, one of the victims said he was unsure if he wanted to press charges. The victim’s views do not excuse King’s criminal conduct, but do suggest that his offense was less serious than first degree murder.

. Indeed, the record suggests that Mr. King understood his responsibility for what he had done, at least in a fundamental manner, well before court proceedings began. After the shooting, King retreated to his car and tried to kill himself by putting the gun to his chin. After the gun failed to discharge, King took out a knife and proceeded to cut himself.